EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CECILIO CORTÉS DEL CASTILLO, acusado y apelante.

*Número:* 16681     *Resuelto:* 17 de octubre de 1962

*Francisco Ponsa Feliú, Manuel A. García Méndez* y *Álvaro R. Calderón, Jr.,* abogados del apelante; *J. B. Fernández Badillo, Procurador General* y *Genoveva R. de Carrera, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

1. En un proceso anterior, el apelante fue acusado de asesinato en primer grado y convicto de segundo. Apeló y revocamos. *Pueblo* v. *Cortés,* 79 D.P.R. 818 (1957). El fiscal le acusó nuevamente por asesinato en primer grado, pero el día señalado para la celebración del juicio, en corte abierta y en presencia del jurado, informó al tribunal que deseaba rebajar la calificación del delito a su grado menor, y que por tanto solicitaba se eliminara el concepto de "deliberación" y toda referencia a la calificación de "primer grado". El tribunal accedió a lo solicitado, y ordenó que se transcribiera la acusación eliminando los conceptos antes mencionados. Se apunta como error esa actuación.

Sostiene el apelante que lo procedente era comenzar el proceso de nuevo, señalar un día para la lectura de la acu-

sación para que el acusado pudiera hacer una nueva alegación. No le asiste la razón. En *Pueblo* v. *Pérez Martínez*, 84 D.P.R. 181 (1961) consideramos una situación parecida a la levantada en este caso. En *Pérez* se acusó originalmente de asesinato en primer grado y se le declaró culpable de segundo. Apeló y revocamos, y al celebrarse un nuevo juicio, se acusó de primer grado pero el jurado volvió a rendir veredicto de segundo. Se apuntó como error que la acusación en el segundo juicio debió haber sido por asesinato en segundo grado. Y eso hubiera sido lo correcto siguiendo a *Velázquez* v. *Delgado*, Hábeas Corpus 773, resuelto el 25 de junio de 1958 y *Green* v. *United States*, 355 U.S. 184 (1957). Pero al resolver la cuestión manifestamos:

"El apelante se queja, sin embargo, de que el error cometido por el Tribunal Superior al enjuiciarlo por segunda vez por un delito de asesinato en primer grado, le fue perjudicial. Discrepamos. En ocasiones anteriores hemos dicho que el asesinato constituye un solo delito que se divide en grados en atención a la perversidad demostrada por el acusado y al solo efecto de la imposición de la pena. *Pueblo* v. *Ortiz*, 62 D.P.R. 258 y *Pueblo* v. *Colón*, 65 D.P.R. 760. La diferencia entre los dos grados del asesinato consiste en que en el asesinato en primer grado la muerte se realiza con malicia premeditada y deliberada mientras que en el de segundo grado la muerte es maliciosa y premeditada pero sin que medie deliberación. *Pueblo* v. *Blanco*, 77 D.P.R. 767. Siendo la deliberación un acto subjetivo del acusado, no puede probarse con evidencia directa y es preciso, por tanto, recurrir a los hechos del caso para determinar si de ellos puede racionalmente inferirse la deliberación. *Pueblo* v. *Rosario*, 67 D.P.R. 371. Es lógico concluir que la prueba para sostener una convicción por el delito de asesinato ya sea en uno u otro grado, es generalmente la misma. En el presente caso, por lo menos, era la misma. Por consiguiente, el apelante no se vio obligado a enfrentarse a una prueba que fuera extraña al delito por el cual se le condenó y que por tal razón se perjudicaran sus derechos."

No vemos cómo puede haber perjudicado al acusado el que se solicitara en presencia del jurado la eliminación del concepto "deliberación" y la calificación de "primer grado", cuando hemos resuelto que no le perjudica el que el jurado tenga ante sí una acusación de asesinato en primer grado con el calificativo de deliberación cuando lo que procedía era una de segundo. Véase además *Pueblo* v. *Delgado*, 44 D.P.R. 154 (1932).

2. En el segundo error se apunta la negativa a permitir a la defensa impugnar a un testigo de cargo. Terminaba de declarar éste y había manifestado haber visto al acusado salir caminando ligero del sitio donde se oyó un disparo y cayó al suelo la víctima. A la pregunta de la defensa "de si había visto algún arma de fuego allí, ¿un revólver?" contestó "No señor". Con esto la defensa dio por terminado el contrainterrogatorio. Entonces el testigo balbucea "El . . . él . . ." y el fiscal interviene y pregunta "¿El qué?" y el juez manifiesta "¿Qué usted iba a decir?", a lo que contesta el testigo "El llevaba una cosa prieta en la mano cuando corrió por detrás". La defensa hace unas preguntas y el testigo contesta que el acusado llevaba "una cosa pequeña, una cosa como un cabo". A preguntas del fiscal declara que era negro y que el acusado "venía caminando ligero con la mano derecha aquí en el bolsillo". ■

Procede entonces la defensa a preguntarle al testigo si él había declarado lo que acabamos de relatar, en alguna ocasión anterior. El propósito era impugnar la declaración prestada. Se suscita entonces la controversia de si procede la impugnación de un testigo por haber omitido declarar hechos esenciales cuando tuvo la oportunidad de hacerlo. La posición de la defensa expuesta al juez de instancia fue en el sentido de que "para impugnar por haber omitido declarar en una ocasión anterior una cosa que se dice ahora y no se dijo antes, lo que se requiere para eso es que el Tribunal esté convencido que en la ocasión anterior era tal y las circunstancias eran tales que era de esperarse y era lo razo-

nable y lo lógico que el testigo en aquella ocasión anterior hubiera dicho eso, pero no se requiere que se le haya hecho una pregunta específica".

El tribunal al resolver el asunto determinó que para que proceda la impugnación de un testigo, por haber omitido declarar sobre una cuestión, precisa que se hubieran formulado preguntas específicas sobre esa materia y que "él silenciara y no dijera nada". Expresa lo siguiente: "La Corte entiende que ni de la declaración, ni del testimonio en el juicio(¹) de Aguadilla se le preguntó sobre eso".

Se acepta que procede impugnar la veracidad de un testigo por haber omitido éste en ocasión anterior hacer manifestaciones sobre un hecho esencial relacionado con el asunto bajo investigación. 1 Underhill's *Criminal Evidence*, § 240 (5th ed. 1956); 3 Wigmore, *Evidence*, § 1042 (3ra. ed. 1940). Esto es así a pesar de que en las disposiciones legales que autorizan la impugnación de testigos—Art. 159 Ley de Evidencia. 32 L.P.R.A. sec. 2151 y art. 245 del Código de Enjuiciamiento Criminal, 34 L.P.R.A. sec. 724—se establece como requisito para impugnar la veracidad de un testigo, el haber hecho manifestaciones incompatibles o que no coinciden con lo declarado durante el juicio. *Skipper* v. *Commonwealth*, 80 S.E.2d 401 (Va. 1954); *Sims* v. *Struthers*, 100 So.2d 23 (Ala. 1958). Ahora bien, es requisito que se trate de un hecho esencial. *Young* v. *Colorado National Bank of Denver*, 365 P.2d 701 (Colo. 1961). Y que, como sostiene Wigmore, hubiera sido natural que el testigo hiciera la manifestación cuando declaró por primera vez. 3 Wigmore, *op. cit.* § 1042(3) (3ra. ed. 1940). Si era natural que expusiera el hecho omitido y no lo hizo, aunque no se le hubiera preguntado específicamente, puede usarse para impugnar su testimonio en corte. ■

(¹) Cuando este testigo declaró en el primer juicio tampoco hizo alusión alguna al hecho sobre el cual declaró en el segundo juicio y que es objeto de discusión.

Procede pues que determinemos si era natural y razonable que el testigo hiciera durante la investigación de los hechos practicada por el fiscal al día siguiente de los sucesos, la manifestación que hizo durante el juicio al efecto de que el acusado cuando se alejaba del sitio donde cayó la víctima llevaba una cosa negra en la mano. Conviene recordar, al hacer esta determinación, que el testigo al mencionar el detalle de que el acusado llevaba algo en las manos cuando se alejaba del sitio donde ocurrieron los hechos, lo hizo como reacción a una pregunta directa de la defensa en ese sentido al terminar el contrainterrogatorio,[2] y no como apunta la defensa "de manera . . . inexplicable e inusitada". Si hubiera surgido espontáneamente durante el juicio, se podría sostener que hubiera sido natural que cuando declaró en la primera ocasión ante el fiscal, hiciera mención de ese detalle pues si lo consideró importante para mencionarlo espontáneamente durante el juicio, razonable es que lo hubiera mencionado también cuando prestó declaración por primera vez. Por eso tiene importancia apuntar que inmediatamente antes del testigo hacer referencia al detalle de que el acusado

---

[2] "P. Dígame, testigo, ¿usted vio cómo sucedió ese disparo, cómo ocurrió ese disparo que usted dice que oyó, usted vio cómo ocurrió?

R. Bueno, yo oí el disparo, vi caer la muchacha al frente.

P. ¿Pero no sabe cómo ocurrió?

R. No sé porque entonces él iba por detrás corriendo.

P. ¿Usted vio algún arma de fuego allí?
¿Un revólver?

R. No señor.

DEFENSA.—
Nada más, Sr. Juez.

TESTIGO.—
El . . . él . . .

HON. FISCAL.—
(Fiscal Freyre)
¿El qué?

HON. JUEZ.—
¿Qué usted iba a decir?

R. El llevaba una cosa prieta en la mano cuando corrió por detrás." (T. de E. págs. 365–366)

llevaba una cosa en la mano, la defensa le había preguntado si había visto un arma de fuego, un revólver. Cuando el testigo prestó la primera declaración relató todo lo que a primera vista parece tener importancia: el disparo, la caída de la víctima, el acusado alejándose del sitio. El detalle de que el acusado llevaba algo en la mano, pudo escapársele de mencionarlo, a menos que se le hubiera preguntado específicamente sobre ese hecho. Y su primera declaración fue una narración expositiva de los hechos, sin que se le formularan preguntas de clase alguna. En esa declaración expuso todo lo que cualquier persona consideraría razonable exponer al describir los hechos que había presenciado el día anterior. No era de importancia mencionar el detalle de lo que llevaba el acusado en la mano. El había expresado lo realmente importante en su declaración. Si en el juicio ofreció ese detalle lo hizo como reacción a una pregunta de la defensa. No puede, por tanto, concluirse que fuera natural y razonable el que el testigo mencionara en su primera declaración el hecho de que el acusado llevaba algo en la mano cuando se alejaba del sitio donde ocurrieron los hechos. No se cometió el segundo error.

3. Pasamos a considerar el tercero de los errores apuntados. Instantes antes del disparo que le privó de la vida, la víctima expresó al alcance del oído de un testigo "Que se creerá este viejo que no quiere que uno se enamore. Será que quiere a sus hijas para abusar de ellas".

La defensa, cuando surgió la cuestión de la admisibilidad de esa manifestación se opuso por entender que era prueba de referencia. Expuso que manifestaciones de esa naturaleza son admisibles como excepción a la regla que excluye la prueba de referencia, cuando ocurren con posterioridad a un hecho excitante—en este caso la agresión de que fue objeto la víctima—porque la excitación "paraliza de tal modo la facultad racional y de deliberación del hombre que las manifestaciones hechas en esos momentos y bajo esas circunstancias tienen garantías de veracidad". Y concluye la de-

fensa, que como en el caso de autos la manifestación fue hecha antes del ataque homicida, se le aplica la regla general y no la excepción.

En *Pueblo* v. *Calventy*, 34 D.P.R. 390 (1925) consideramos la cuestión de la admisibilidad de las manifestaciones espontáneas. Citamos de Wigmore en parte lo siguiente:

"Este principio general se funda en la experiencia de que bajo ciertas circunstancias externas de conmoción física puede producirse una tensión de excitación nerviosa que paraliza las facultades reflejas y pierden su control, de modo que la manifestación que entonces tiene lugar responda de una manera espontánea y sincera a las sensaciones y percepciones reales ya producidas por la sacudida externa. Puesto que esta manifestación se hace bajo el dominio inmediato y sin control de los sentidos, y durante el breve período en que las consideraciones de interés propio no podían haberse traído enteramente a colación por la reflexión razonada, la manifestación puede tomarse como especialmente digna de crédito (o, al menos, como que carece de los motivos generales de falta de confianza), y por tanto como que expresa la verdadera tendencia de la creencia del que habla en cuanto a los hechos que acaban de ser observados por él; y puede, por tanto, recibirse como testimonio de aquellos hechos."

Así vemos que bajo ciertas circunstancias son admisibles manifestaciones que como regla general no lo serían por constituir prueba de referencia. Véanse además: *Pueblo* v. *González*, 66 D.P.R. 202 (1946) y *Pueblo* v. *Muñoz*, 68 D.P.R. 171 (1948). ■

En reciente dictamen la Corte Suprema de Illinois en el caso de *People* v. *Poland*, 174 N.E.2d 804 (Ill. 1961) se expresó así sobre la excepción a la regla que establece como inadmisible la prueba de referencia:

"Ha surgido, como excepción reconocida a la regla de prueba de referencia, el principio de que, bajo ciertas circunstancias, lo que ha sido generalmente catalogado como 'declaraciones espontáneas' o 'manifestaciones excitadas' es admisible como excepción a dicha regla. Quizá el comentario clásico sobre la razón que sostiene esta excepción es el de Wigmore."

Y entonces pasa a citar el que transcribimos con aprobación en *Pueblo* v. *Calventy*, supra.

Sigue manifestando el tribunal en el caso de *Poland:*

"El principio ha sido concisamente expuesto, por la Corte Suprema de California: 'Cuando una manifestación es hecha bajo la inmediata influencia del hecho al cual se relaciona y tan contemporánea a él . . . como para negar cualquier probabilidad de fabricación, dicha declaración es admisible'. *Showalter* v. *Western Pacific Railroad Co.*, 16 Cal.2d 460, 106 P.2d 895, 899.

"Tres factores son necesarios para traer la manifestación dentro de la excepción a la regla de prueba de referencia: (1) un evento suficientemente alarmante que produzca una manifestación espontánea e irreflexiva; (2) falta de tiempo para inventar la manifestación; y (3) la manifestación debe referirse *al evento* que la causa."

Pero véase sobre estos tres requisitos el caso de *Murphy Auto Parts Company* v. *Ball*, 249 F.2d 508 (D.C. cir. 1957); Nota 47 Calif. L. Rev. 939 (1959). Ver además *Commonwealth* v. *Friedman*, 165 A.2d 678 (Penn. 1960). ■

Así vemos que no es requisito el que el hecho excitante que pueda producir una manifestación admisible por vía de excepción a la regla de la prueba de referencia, *sea el acto por el cual se juzga al acusado*. Véase además 6 Wigmore *On Evidence*, § 1753 (3ra. ed. 1940), donde se expresa: "Lo que se exige aquí es sencillamente que ocurra un suceso inusitado y sorpresivo que pueda producir excitación nerviosa y una manifestación espontánea (ante sección 1749). Es inmaterial el hecho de que ese suceso inusitado y sorpresivo sea de por sí relevante a la cuestión envuelta; aun cuando en el caso corriente resulte relevante." Y a McCormick *On Evidence*, § 272 (1954) a la pág. 579, donde se expresa "Bajo la práctica prevaleciente, la declaración por sí misma a veces se toma como evidencia de la ocurrencia del suceso inusitado." Y más adelante apunta que "la fórmula a ser aplicada por el juez es, ¿fue la declaración espontánea, excitada o impulsiva, o fue la misma producto de la reflexión

y deliberación?" Claro está que sería imposible establecer una regla fija que sirva para todos los casos. Parece ser la mejor norma al considerar la admisión de manifestaciones como la aquí envuelta, que cada caso se considere por sus méritos intrínsecos, siendo deber de todo juez ejercer una informada y cuidadosa discreción al determinar si los hechos y circunstancias presentes justifican la admisión de la evidencia. *Washington* v. *State*, 118 So.2d 650 (Fla. 1960); *Frazee* v. *State*, 153 P.2d 637 (Okl. 1944).

La prueba en el caso de autos revela que momentos antes de la víctima hacer las manifestaciones en controversia, "ella venía corriendo, salió de la casa hacia nosotros; venía corriendo; venía; con la mano izquierda se aguantaba la falda que traía puesta" y cuando se le pregunta al testigo que si había notado algo en ella cuando venía contestó "Yo noté que cuando llegó donde nosotros estábamos estaba nerviosa, completamente nerviosa" y más adelante cuando le preguntan "¿Y dice usted que cuando venía hacia donde estaban ustedes por esa carretera venía con la mano izquierda aguantándose la falda?" contesta "La falda, si señor". Luego de esto es que el testigo manifiesta "Entonces ella nos dijo", la defensa se opone, y surge el incidente que motiva el presente apuntamiento. ■

Esta prueba, a nuestro juicio, demuestra que a la víctima le ha ocurrido algo, viene corriendo y está nerviosa, y lo que le ha ocurrido hace que a las primeras personas con quien se encuentra le abra su corazón y le haga las manifestaciones antes transcritas. No podemos pensar que una muchacha de dieciséis años haya hecho esas manifestaciones premeditadamente. Las manifestaciones controversiales iban a la entraña misma de las relaciones paterno-filiales y fueron hechas en un momento de clara excitación. La muchacha estaba nerviosa y venía corriendo sujetándose la falda. Todas esas circunstancias hacen que las manifestaciones pasen la prueba que se requiere para que sean admisibles. Cier-

tamente están presentes los requisitos que las autoridades apuntan deben coincidir para que sean admisibles.

En el caso de *Dodd* v. *State*, 233 P. 503 (Okl. 1925) se permitió a un testigo declarar sobre ciertas manifestaciones que le hizo la víctima. Esas manifestaciones fueron hechas antes del disparo que le privó de la vida, pero después de un incidente inicial entre el acusado y la víctima. Explica así la corte la situación:

"Esto fue con posterioridad a la discusión en la estación de gasolina que dio comienzo al incidente que culminó en los disparos a la víctima, y bajo todas las circunstancias creemos que constituyó parte del *res gestæ* y correctamente admitido como tal.

"El incidente en que resultó muerto el occiso fue de hecho una transacción continua desde el comienzo de la pelea en la estación de gasolina, siguiendo con el incidente en la oficina del hotel y hasta que se produjo la muerte en la escalera o en el segundo piso de éste, y según la evidencia, la manifestación del testigo Brandon antes expuesta, fue hecha ocho o diez minutos antes de que se hicieran los disparos que dieron muerte al interfecto."

Véanse además: *Brents* v. *State*, 247 S.W. 1061 (Ark. 1923); *State* v. *Hessenius*, 146 N.W. 58 (Iowa 1914); *People* v. *Gibson*, 52 N.E.2d 1008 (Ill. 1944); *Kraut* v. *State*, 280 N.W. 327 (Wis. 1938); 1 Wharton's *Criminal Evidence* § 281 (12va. ed. 1955); McCormick *On Evidence*, § 272 p. 578 (1954).

4. Consideremos el cuarto error. Se relaciona con un incidente surgido con motivo de una carta admitida en evidencia sin objeción por parte de los fiscales. El acusado sostenía que la víctima se había suicidado y que la carta en cuestión contenía un mensaje suicida. El propósito era establecer que la víctima le había dado consideración a la idea de privarse de la vida. Cuando la defensa informaba al jurado, hizo alusión a que los fiscales habían admitido la autenticidad de la carta. Los fiscales protestaron de tal aseveración. Sostienen que el hecho de que no objetaran a la admisión de

la carta no conlleva que admitieran su autenticidad. Unicamente aceptaron la suficiencia de la prueba de identificación necesaria para que el documento fuera admitido en evidencia. La defensa por su parte sostiene que de ser esto así le perjudicaría pues se vio impedida de ofrecer otra prueba para establecer su autenticidad, incluyendo prueba pericial.

El juez de instancia al resolver, manifestó que la cuestión de autenticidad de la carta y del valor que tenía como prueba sería determinada por el jurado. ■

La circunstancia de que los fiscales no objetaran a la admisión del documento no tiene la importancia que la defensa le atribuye. Cuando los fiscales manifestaron que no objetaban, ya la carta había sido suficientemente identificada para que el juez la admitiera aún con la objeción de los fiscales. Se había cumplido con los preceptos de la Ley de Evidencia—32 L.P.R.A. secs. 1831, 1834.(³) Un hermano de la víctima había identificado la letra como la de ella. Eso era suficiente para que fuera admisible. *Pueblo* v. *Martí,* 20 D.P.R. 121 (1914). Así carece de fuerza el argumento de que la defensa se vio privada de presentar un perito para demostrar la autenticidad de la letra. La posición de los fiscales obviamente fue al efecto de que habiéndose cumplido

---

(³) Disponen así las referidas secciones:

Sección 1831

"Todo escrito podrá probarse:

1. Por cualquiera persona que hubiere presenciado el otorgamiento del escrito; o

2. Mediante evidencia de la autenticidad de la letra del otorgante; o

3. Por un testigo firmante del escrito."

Sección 1834

"La letra de una persona podrá probarse por cualquiera persona que la creyere suya y le hubiere visto escribir; o hubiere visto algún escrito tenido por suyo y de acuerdo con el cual hubiera procedido o a cuyo cumplimiento se le hubiera obligado; o que consistiere en cartas recibidas por el testigo debidamente cursadas por correo, en contestación a otras que hubiere dirigido por correo a su presunto corresponsal, llegando de este modo a conocer la letra de dicha persona."

con lo preceptuado en la Ley de Evidencia para identificar y hacer admisible un documento, era fútil objetar su admisión. [11]

Era el jurado el que en última instancia tenía que determinar sobre la autenticidad y sobre el valor que le daba al escrito presentado. 7 Wigmore *op. cit.* sec. 2135 A ese efecto dice Wigmore:

"Se desprende que, luego de una resolución sosteniendo la suficiencia de la evidencia presentada por la parte que presenta el documento, éste va al jurado, antes que la parte contraria pueda ofrecer evidencia en contrario; y esta evidencia en contrario, cuando se ofrezca, debe ser dirigida al jurado, no al juez, puesto que el juez ha resuelto como cuestión de derecho sobre la suficiencia de la evidencia, y la cuestión queda ahora en manos del jurado. *Por el contrario, si la parte adversa no ofrece prueba en contrario, aun así no hay ley alguna que obligue al jurado a aceptar el otorgamiento; ellos quedan libres para considerar la evidencia sin que la ley les imponga una conclusión."* [Énfasis suplido.] ▪

5. El juez de instancia al instruir al jurado manifestó: "La ley no exige un determinado número de testigos para la comprobación de un hecho o circunstancia. Un sólo testigo que merezca entero crédito puede ser suficiente para la justificación de un hecho o circunstancia salvo perjurio o traición". La defensa tomó excepción a esta instrucción "por entender que esa instrucción no puede darse en este caso donde no hay ningún testigo directo". Invoca para sostener su posición lo dispuesto en el Art. 18 de la Ley de Evidencia—32 L.P.R.A. sec. 1661—al efecto de que "[l]a evidencia directa de un [solo] testigo que merezca entero crédito es prueba suficiente de cualquier hecho salvo perjurio o traición". La tesis de la defensa es "que puede considerarse probado cualquier hecho con el testimonio de un solo testigo siempre y cuando que dicho testimonio sea prueba directa de la ocurrencia del hecho en cuestión". Y eso precisamente es lo que ha ocurrido en el caso de autos. Cada uno de los

testigos de cargo declaró sobre un hecho que le constaba de propio conocimiento, sobre incidentes que había presenciado. Su testimonio constituía prueba directa del hecho que relataba. Por vía de ejemplo: al considerar el segundo error hicimos referencia al testimonio de uno de los testigos de cargo, quien vio cuando el acusado salía caminando ligero de la casita donde ocurrieron los hechos. Este testimonio es prueba directa de ese incidente específico. Otros testigos declararon sobre otros incidentes que presenciaron. La instrucción impugnada explica correctamente la ley al exponer que el testimonio de un testigo que merezca entero crédito, es prueba suficiente de cualquier hecho. El fiscal ofreció evidencia directa sobre los hechos y circunstancias que tendían a relacionar al acusado con la comisión del delito que se imputaba. La declaración de un solo testigo basta para dejar establecido cada uno de esos hechos y circunstancias.

La Ley de Evidencia al definir lo que es prueba indirecta expresa, 32 L.P.R.A. sec. 1630:

"Evidencia indirecta es la que tiende a demostrar el hecho controvertido, probando otro distinto, el cual, aunque verdadero, no demuestra dicho hecho de manera concluyente, pero que produce una inferencia o presunción de su existencia . . ."

Así vemos que claramente hay que probar un hecho del cual se infieren otros. Dispone la Ley de Evidencia—32 L.P.R.A. sec. 1882 . . . que "es inferencia la deducción que de los hechos probados hace en su discernimiento el juez o jurado . . .". La evidencia circunstancial no es otra cosa que las inferencias que surgen de una serie de hechos probados. *Hatfield* v. *Levy Bros.*, 117 P.2d 841 (Calif. 1941). Los hechos de los cuales se infieren otros se establecen con prueba directa y el testimonio de un solo testigo que merezca entero crédito, basta para establecerlos. *People* v. *Yokum*, 302 P.2d 406 (Calif. 1956).

6. El juez de instancia al sometérsele la acusación de portar armas declaró culpable al acusado. La defensa ataca

la sentencia condenatoria. Sostiene que el Pueblo tenía que establecer que el acusado no estaba autorizado a portar armas. Es manifiestamente frívola la contención. En innumerables ocasiones hemos resuelto que "[e]n casos de portación o posesión ilegal de armas de fuego el fiscal no viene obligado a probar que el acusado no tenía licencia con tal fin, cuando se ha alegado tal hecho en la acusación y se ha probado la portación o posesión del arma, ya que en ellos surge la presunción de portación o posesión ilegal y es al acusado a quien incumbe destruir tal presunción". *Pueblo* v. *Pacheco*, 78 D.P.R. 24, 30 (1955); *Pueblo* v. *Oquendo*, 79 D.P.R. 542 (1956); *Pueblo* v. *Segarra*, 77 D.P.R. 736 (1954); *Pueblo* v. *Negrón*, 76 D.P.R. 346 (1954); *Pueblo* v. *Rupizá*, 72 D.P.R. 744, 747 (1951). Y aquí se alegó en la acusación que el apelante no tenía licencia de portar armas.

*Se confirmarán las sentencias apeladas.*