EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* MANUEL DUEÑO MAYSONET, acusado y apelante.

*Número:* CR-66-19      *Resuelto:* 13 de junio de 1967

*Olga Cruz Jiménez, José L. Novas Vargas* y *José L. Novas Dueño,* abogados del apelante. *J. B. Fernández Badillo, Procurador General,* y *Américo Serra, Procurador General Interino,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante fue declarado culpable por un jurado de un delito de contra natura y sentenciado a cumplir de 3 a 10 años de presidió.

En este recurso señala la comisión de varios errores, entre ellos el de la insuficiencia de la prueba para sostener su convicción, y la transmisión al jurado de instrucciones erróneas sobre el alcance probatorio del testimonio del policía Jesús M. Aponte.

La prueba testifical de cargo consistió en los testimonios de Octavia Carrasquillo, del policía Jesús M. Aponte y del menor perjudicado Saúl Cotto Carrasquillo.

El Procurador General resume correctamente dicha prueba en la siguiente forma:

"Octavia Carrasquillo declaró, en síntesis, que Saúl Cotto Carrasquillo es su hijo y que él tiene trece años de edad; que el acusado fue a su casa el día 23 de febrero de 1964, pero que antes del día 21 de febrero ella no conocía al acusado; que antes del 21 de febrero su hijo Saúl salió de su casa con otro hermanito a llevar unos paquetes al correo; que dos días después el acusado fue a su casa con el propósito de que ella dejara ir a Saúl a trabajar a la casa de él por $60.00 mensuales; que ella le dijo que no porque Saúl estaba bajo tratamiento ya que estuvo en la escuela siete años y no aprendió nada; que ella le dijo al acusado que no le 'sonsacara' a su hijo porque está en tratamiento y porque antes de eso ya su hijo le había contado lo que el acusado le había hecho dos días antes; que para el día 21 de febrero de 1964 Saúl faltó a su casa y ella empezó a echarlo de menos; que como a las doce fue al Cuartel de la Policía a informar que su hijo había desaparecido y que unos días antes un señor había estado en su casa y lo había 'sonsacado' para llevarlo a hacerle trabajos; que ella no le dio a la Policía el nombre del acusado pero sí le informó el número de la tablilla del carro en que el acusado había ido a su casa; que volvió a ver a Saúl a los seis días cuando lo llevaron los policías; que ella entonces le preguntó donde había estado y el niño le dijo: 'aquel señor que estuvo aquí a ofrecer dinero me llevó . . .'. (T.E. págs. 91–103) El tribunal no le permitió continuar declarando sobre lo que su hijo le dijo al regresar a su casa. Véase T.E. págs. 103-106.

Jesús M. Aponte declaró, en lo pertinente, que es policía estatal de Puerto Rico; que el día 21 de febrero de 1964, a la una y cuarenta y cinco de la tarde, se personó al Cuartel de la Policía

de Hato Rey la señora Octavia Cotto Carrasquillo informando la desaparición de su hijo; que luego ella consiguió el número de la tablilla de un vehículo y que a través del Departamento de Obras Públicas él averiguó el mismo día 21 de febrero que el vehículo pertenecía al acusado. (T.E. págs. 118–123, 139) Continuó diciendo que en unión al Teniente Gualberto Torres hizo diligencia para localizar al acusado, quien vivía en la calle Damasco 1315 en Puerto Nuevo; que para el día 26 de febrero se quedó cerca de la residencia del acusado y empezó a indagar si era cierto que el acusado vivía allí a lo cual los vecinos le dijeron que sí; que a eso de las nueve y cinco de la noche de ese día 26 de febrero vio que el acusado llegó a la casa con el niño Saúl Cotto; que como ellos (la Policía) tenían una orden de arresto tocaron a la puerta de la casa; que el acusado se asomó por una ventana y entonces le informaron sobre la orden de arresto contra él y le ordenaron que abriera la puerta; que al abrir la puerta procedieron a arrestarlo y en ese momento el niño Saúl Cotto—que estaba detrás de la puerta—se les acercó a tocarles las manos y les dijo 'gracias, gracias'; que luego de sacarlo para afuera el niño le dijo que el acusado 'había mantenido relaciones íntimas con él, que él se tenía que poner, que el niño le cogió miedo, que le decía que por allí mataban a los niños y que después salía en el periódico los nombres'; que el niño le dijo que el acusado lo tenía a 'sandwiches' y jugos, que 'por la tarde y por la noche le metía el pipí por el fundillo', y que por la tarde y por la noche el acusado 'lo cogía y lo llevaba a la cama y le metía el pipí por el culo, después que se le montaba y a él y que le dolía, que no podía . . .' (T.E. págs. 139–145). Declaró, además, el policía Aponte que el niño Saúl le dijo que el acusado había tenido esas relaciones sexuales con él en su residencia de la Calle Damasco 1315. (T.E. pág. 150.)

Durante la repregunta el policía Aponte, dijo, en lo pertinente, que en la noche del 26 de febrero de 1964 vio cuando el acusado entró a su residencia acompañado del niño Saúl Cotto; que cuando el acusado abrió la puerta el niño salió y dijo 'gracias, gracias', cogiéndolo por la mano; que entonces él (el testigo) sacó al niño para afuera y le preguntó que le pesaba y que hacía allí dentro, y allí mismo el niño le contó lo que le había sucedido; que mientras tanto el acusado estaba al lado de la patrulla esperando que viniera la 'patrol' para llevárselo; que el niño le dijo 'que estaba asustado, que no quería decir bien lo que

le había pasado porque creía que lo íbamos a meter preso nosotros', pero que a pesar de ello contó todo lo ocurrido; que el niño le dijo que el acusado lo había llevado a un sitio que deban clase de música que él (el niño) 'no se atrevía irse porque no conocía bien el camino para llegar a su casa', 'no sabía irse solo de allí'; que estuvo hablando con el niño cerca de veinticinco minutos mientras esperaban la 'patrol' y que éste también le dijo que el acusado había ido a la casa de su mamá para que le permitiera ir a su casa a trabajar y limpiar el carro. (T.E. págs. 183–191.)

Saúl Cotto Carrasquillo testificó que tiene trece años de edad; que para el mes de febrero de 1964 vivía con su mamá y se fue a vivir con el acusado en Puerto Nuevo porque 'tenía miedo porque mi mamá me iba a llevar a la Juvenil y me fui con él'; que es 'retardado' y que estuvo siete años en la escuela; que el acusado no le hizo nada y que 'era que yo estaba nervioso por eso y dije eso porque yo no me atrevía decir que él me había hecho eso'. (T.E. págs. 193–196.) Admitió que lo que estaba declarando no era lo mismo que le había dicho al fiscal en su oficina; que le había dicho al fiscal que el acusado le había hecho 'cosas malas por el fundillo, pero era que yo estaba nervioso y dije eso'; que esa mañana le había dicho al fiscal en su oficina que el acusado le había hecho 'fresquerías con el pipí por el fundillo', y que había estado seis días en la casa del acusado; que al cabo de los seis días la policía fue a buscarlo y que lo que le contó al policía que fue a buscarlo sobre lo que le había hecho el acusado eran mentiras. (T.E. págs. 197–199.) Mas [*sic*] adelante, este testigo dijo que el acusado le hacía 'aguajes de fresquerías pero no me hacía nada'. (T.E. pág. 204.) A preguntas del fiscal declaró como sigue:

'Hon. Fiscal:

P—El te hacía aguajes de fresquerías?

R—Sí.

P—Que aguajes de fresquerías te hacía?

R—De meterme el pipí por el fundillo.

P—Te metía al pipí por dónde?

R—Por el fundillo.

P—Ese era el aguaje de fresquería que te hacía?

R—Sí, señor.

F—Pues, nada más, vuestro honor.' (T.E. pág. 204.)

Y a preguntas del juez que presidió el proceso y del fiscal dijo lo siguiente:

'Hon. Juez:

P—Explícale a las damas y caballeros del Jurado qué era el aguaje de fresquería ese, qué era?

R—De meterme el pipí por el fundillo.

. . . . . . . .

Hon. Juez:

Por eso, yo le pregunto ahora al menor y anótese excepción si se quiere, yo le pregunto al menor que esos aguajes de fresquerías cuándo eran, o qué eran, si es que en alguna ocasión te hizo aguajes de fresquerías, cuándo fue que te hizo aguajes de fresquerías?

R—Cuando yo estaba haciendo el trabajo, que él me llamaba.

P—Cuando yo estaba haciendo qué?

R—Cuando él me tenía allá.

P—Dónde?

R—En la casa. No me hizo nada, me llevaba a la playa, me pagaba jugos y todo.

P—Los aguajes de fresquerías, cuáles eran?

R—Tratando de hacerme eso, pero no hizo "ná".

P—O sea, tratando de hacerte algo, pero no te hizo nada, pero ese tratar, qué era lo que te metía, qué te hacía?

R—Yo no comprendo lo que usted dice.

P—Tú dices, aguajes. Aguajes de darte un puño, o no es eso, como uno cuando pone el puño así, eso es aguaje. Qué era el aguaje que él te hacía? Cómo lo hacía o qué era lo que él hacía.

R—Bueno, que trataba de tirárseme encima pero no se me tiraba.

P—Trataba de tirársete encima . . . . ?

R—Pero no me hizo nada.

P—Y qué es eso de que trataba de tirársete encima? Qué era lo que hacía? Yo quiero que me expliques cómo era que él se trataba de tirársete encima a tí.

Hon. Fiscal:

Me permite el Tribunal?

Hon. Juez:

Cómo no.

Hon. Fiscal:

Cómo era que él trataba de tirársete encima a tí, cómo era?

R—Como los perros se le tiran a las "desos" . . .

Hon. Juez:

P—Como los perros se le tiran a las qué?

R—A las perras.

Hon. Fiscal:

Pero, qué hacía él con la ropa de él o con él mismo, para hacer lo que tú dices que hacía, aguajes de fresquerías?

R—El estaba con la ropa.

P—Se quitaba la ropa?

R—No.

Lic. López Carrillo:

Fue al revés la contestación.

Hon. Juez:

Que no se quitaba la ropa.

Hon. Fiscal:

P—No se quitaba la ropa. Qué hacía?

R—Más nada.

P—Y tú, te quitabas la ropa?

R—No.

P—Qué fresquerías te hacía?

R—Ninguna más, me hizo aguajes, lo que yo le dije.

P—Cómo eran los aguajes?

R—Como le hace un perro a la perra.

P—Cómo es que le hace un perro a la perra?

R—Se le tira encima.

P—Por dónde se te tiraba encima?

R—En el lado se me tiraba.

P—Ah?

R—En el lado.

P—Por qué lado?

R—Así, en el lado, por aquí.

P—Pero se te tiraba por el lado cómo, de frente, frente a tí?

R—Sí.

P—O de espalda a tí?

R—En el lado, se me tiraba así en el lado.

P—Y qué te hacía? Ahorita cuando yo te preguntaba qué fresquerías él te hacía tú dijiste algo, dijiste algo de que la fresquería que él te hacía era meterte el pipí por el fondillito, ah?

R—Era que yo estaba nervioso y dije eso.' (T.E. págs. 204, 205–208.)

Admitió el testigo que él le había dicho a su mamá, al policía y a los fiscales que el acusado le había 'metido el pipí por el fondillito'. (T.E. pág. 210.)

Luego de serle leída la declaración prestada por él ante el fiscal, el niño Saúl Cotto continuó declarando que conoció al acusado el día que fue a su casa a lavarle el carro; que el acusado le regalaba dinero, dulces y otras cosas; que también lo llevaba a la playa y a 'musiquear'; que estuvo seis días viviendo con el acusado en su casa y dormía en la misma cama con el acusado; que el acusado dormía 'arriba, para allá, y yo para acá' en la misma cama; que él le mintió al policía porque le 'salió eso de la boca'. (T.E. págs. 224–231)." (Informe Procurador General, págs. 4 a 11.)

Las manifestaciones hechas por el menor Saúl Cotto Carrasquillo al policía Aponte fueron correctamente admitidas en evidencia como parte del *res gestae*. Esas manifestaciones fueron espontáneas y cumplen con los requisitos de (1) un evento suficientemente alarmante que produzca una manifestación espontánea e irreflexiva; (2) falta de tiempo para inventar la manifestación; y (3) la manifestación se refiere al evento que la causó. *Pueblo* v. *Cortés del Castillo*, 86 D.P.R. 220 (1962); Wigmore, *On Evidence*, 3ra. ed., Vol. VI, sec. 1750. El hecho de que el menor hiciera las manifestaciones al policía después de éste preguntarle lo que le había sucedido no le resta espontaneidad a dichas manifestaciones en vista de que el menor se encontraba todavía bajo la influencia del evento alarmante. *Pueblo* v. *González*, 66 D.P.R. 202 (1946); Wharton's *Criminal Evidence*, 12th ed., Vol. I, sec. 280, pág. 633.

■ Una vez admitidas en evidencia esas manifestaciones las mismas pueden considerarse como dignas de crédito y pueden recibirse como testimonio de los hechos a que se contraen. *Pueblo* v. *Cortés del Castillo*, supra; Wigmore, *op. cit.* Vol. VI, sec. 1747, pág. 135.

Desde la silla testifical el menor perjudicado negó que las manifestaciones que hiciera al policía Aponte fueran ciertas. El fiscal impugnó su testimonio a base de manifestaciones anteriores contradictorias. Se creó así un conflicto en la prueba y el juez permitió correctamente que el jurado dirimiera dicho conflicto, habiéndolo hecho éste en contra del apelante.

En relación con las manifestaciones hechas por el menor al policía Aponte, el juez transmitió al jurado la siguiente instrucción:

"La prueba, repito, que ustedes tienen para analizar, para considerar, es la prueba ofrecida aquí, la de Saúl, lo que Saúl dijo, lo que Aponte dijo, lo que doña Octavia dijo y la prueba documental.

Como les dije anteriormente, damas y caballeros del Jurado, no requiriéndose prueba de corroboración del testimonio de Saúl, el testimonio de Manuel Aponte, del Policía Aponte, de ser creído por ustedes en su totalidad, sería suficiente en derecho para dejar establecido un caso, si es que ustedes lo creen, si es que ustedes le dan crédito al testimonio de Manuel Aponte. Eso lo van a resolver ustedes. Es decir, que ustedes son los juzgadores de hecho, ustedes son los que van a resolver cuánto crédito les merece el testimonio de Manuel Aponte y si les merece entero crédito o si no les merece crédito también, y si de ese testimonio de Manuel Aponte surgieran, a juicio de ustedes, todos los elementos del delito, como la penetración, por leve que ésta fuere, y la relación del acusado con esa penetración, junto al resto de la prueba que ustedes pudieren tener ante sí, si así lo creen que se les ha probado un caso de infame delito de contra-natura o de tentativa de contranatura o de acometimiento y agresión, dependiendo del crédito que ustedes le den a todos esos testimonios tomados conjuntamente entre sí." (T.E. págs. 363-4.)

■ Esta instrucción es errónea y lesionó gravemente los derechos del acusado a ser juzgado mediante el debido procedimiento en un juicio justo e imparcial. Si el jurado creía en su totalidad el testimonio del policía Aponte, entonces tal testimonio, según la instrucción, era suficiente en derecho para dejar establecido un caso. Ello equivale a decir que la culpabilidad del acusado quedaba probada si el testimonio del policía Aponte le merecía entero crédito. No hay base alguna en el récord para que el jurado pudiera negarle credibilidad al policía Aponte. Este agente fue el que diligenció la orden de arresto contra el acusado, encontrándole en su hogar junto al menor perjudicado. Éste admitió mientras declaraba en el juicio como testigo de cargo que hizo las manifestaciones a dicho policía aunque negó que fuera cierto el contenido de dichas manifestaciones. Por otro lado, el acusado no presentó prueba de defensa alguna por lo que repetimos no hay nada que pueda poner en duda la veracidad del testimonio del policía. La duda que pudiera surgir era en cuanto a la certeza de los hechos relatados por el menor al policía, en vista de que aquél había negado su veracidad. El policía, sin embargo, no podía deponer sobre la veracidad de los hechos relatados por el menor porque él no tenía conocimiento personal de lo sucedido al menor con el acusado. La veracidad de los hechos relatados era lo que estaba en controversia una vez el menor los negó. Instruir por lo tanto, al jurado que si el testimonio del policía merecía entero crédito, el caso contra el acusado quedaba probado, fue un error perjudicial.

Sostiene el Procurador General que el apelante ha entresacado de las instrucciones las ya transcritas manifestaciones del juez para tratar de sostener un error en apelación y copia otras instrucciones sobre la prueba ofrecida para impugnar el testimonio del menor.

Estas instrucciones, que antecedieron a la impugnada, son como sigue:

"Aquí, damas y caballeros del Jurado, por el Ministerio Público se ha traído prueba tratando de impugnar la veracidad de su testigo, Saúl Coto Carrasquillo.

Generalmente a una parte que trae a un testigo, no le es dado, en derecho, no le es permitido en derecho, impugnar su propio testigo.

Como excepción se permite por Ley, y cuando un testigo de una parte le resulta hostil o le resulta antagónico o le sorprende, en otras palabras, en la silla testifical, la parte que lo presenta tiene derecho a impugnar la veracidad de ese testigo.

Aquí el Tribunal permitió que el Fiscal ofreciera prueba tratando de impugnar la veracidad de Saúl Coto Carrasquillo, porque entendió que su testimonio, el de Saúl, fue sorpresivo para el Fiscal y fue antagónico a la teoría del Fiscal.

Ahora bien. Ustedes van a considerar la prueba ofrecida por el Fiscal para impugnar la veracidad, para determinar la credibilidad que Saúl Coto Carrasquillo les merezca a ustedes.

Es decir, ustedes no van a resolver este caso por lo que Saúl Coto le dijo al Ministerio Público la mañana . . . como dijo él que le había dicho la mañana en que lo entrevistó. Eso no es prueba. Ustedes no van a resolver este caso por lo que Saúl Coto le dijo al Fiscal cuando lo entrevistó allá, no.

Ustedes van a resolver, van a considerar eso para determinar cuándo es, que a su juicio, Saúl Coto dice verdad, cuándo es que les merece crédito a ustedes Saúl Coto, pero la prueba que ustedes van a considerar es la desfilada por aquí, la de Saúl Coto, la del policía Aponte y el certificado . . . la de la señora madre, doña Octavia, y el certificado de nacimiento de Saúl. Esa es la prueba, lo que declararon aquí.

Lo otro, el hecho de que se trajera prueba de que Saúl Coto había dicho un hecho en tal ocasión, cierta manifestación contradictoria, eso se utilizó por el Fiscal para demostrar a ustedes o intentar demostrar a ustedes que el testimonio de Saúl aquí no les debe merecer crédito, verdad, y entonces ustedes van a resolver si, después de comparadas esas manifestaciones contradictorias, si Saúl les merece crédito cuando dice aquí que a él no le pasó nada o si no les merece crédito a ustedes cuando dice aquí que no le pasó nada. Ustedes van a resolver eso como cuestión de credibilidad." (T.E. págs. 361 a 363.)

Se notará que esta instrucción únicamente indica al jurado el propósito de la prueba de impugnación del testimonio del menor, haciendo claro que esa prueba no debe considerarla el jurado como prueba de los hechos imputados al acusado y sí como prueba que puede afectar la credibilidad del menor. Tal instrucción no subsana el error cometido posteriormente en la instrucción sobre el efecto del testimonio del policía, una vez éste mereciera entero crédito.

*Tratándose de un error fundamental que ha perjudicado al acusado, la sentencia apelada será revocada y se ordenará la celebración de un nuevo juicio.*

El Juez Asociado Señor Belaval está conforme con los resultados. El Juez Asociado Señor Dávila no intervino, al igual que el Señor Juez Presidente Negrón Fernández.