EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS DÍAZ RÍOS, acusado y apelante.

*Número:* CR-66-429      *Resuelto:* 20 de octubre de 1967

*Manuel López Carrillo,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Héctor R. Orlandi Gómez, Procurador General Auxiliar,* abogados de El Pueblo.

PER CURIAM: Convicto del delito de violación mediante el veredicto de una mayoría de diez a dos del jurado, Luis Díaz Ríos fue sentenciado por el Tribunal Superior, Sala de San Juan, a cumplir la pena de tres a diez años de presidio, en 20 de octubre de 1964.

Apunta en apelación que (1) "el veredicto es contrario a la prueba"; (2) "el veredicto es contrario a derecho . . . porque la prueba de corroboración falló en establecer el delito de violación en la forma que la ley requiere"; (3) incidió el tribunal de instancia al instruir al jurado sobre lo que es corroboración de los hechos constituyentes del delito de violación; y (4) incidió dicho tribunal al denegar la moción de nuevo juicio.

Examinado el récord del caso, concluimos que los apuntamientos en cuestión carecen de mérito. A los fines de justificar esta adjudicación se hace necesario hacer el breve resumen de la prueba que aparece a continuación.

La perjudicada testificó que conoció al apelante mientras se dirigía de San Juan a Isabela, de donde era vecina, al abordar él cerca de Bayamón la *Motor Coach* en que ella viajaba. A preguntas del apelante le dio su nombre y su teléfono en su oficina en la Administración de Parques y Recreo, en San Juan. Más tarde la llamó varias veces a la oficina, obtuvo la dirección de su residencia, una casa de huéspedes de la testigo Arcadia Cruz Cariles y la madre de ésta, y allí la visitó varias veces. Luego aceptó una invitación para ir a comer al restaurante San José en la carretera de Caguas. En otra ocasión fueron con otra pareja a bailar a otro sitio. En la víspera del día de San Juan de 1964 fue la perjudicada con el apelante al restaurante San José pero como no había langostas él insistió en ir a "Richard" en Loíza Aldea. De regreso y como ella expresara su deseo de regresar porque era tarde, como las 10:45 P.M., él tomó otro camino que dijo ser un atrecho; paró el vehículo. Le preguntó a la perjudicada si lo quería a lo que ella contestó que no porque "si no quedaba nada mío yo no le podía decir que lo quería." Al prender él un cigarrillo, ella notó que tenía su miembro viril por fuera. Trató de huir pero él la agarró. La amenazó con una llave diciéndole que "le iba a dar por la tapa de los sesos . . . así empezamos la lucha, él a luchar conmigo y yo con él, y me tiró contra el asiento; mi cabeza cayó sobre el guía del carro y ahí el traje, el zipper, con la fuerza que yo hacía, se me rompió y en seguida él, diciéndome, amenazándome con la llave y al mismo tiempo apretándome las manos en la parte de atrás del cuerpo, diciéndome que me iba a matar, ahí mismo, con la misma lucha, él me pudo arrancar una faja que yo tenía . . . ." Añadió que "como las fajas que uso son livianas, que no son apre-

tadas, se la trajo en las manos." Continuó testificando la perjudicada que "el zipper se abrió y como yo no uso la ropa muy pegada, ceñida, se me subió con la lucha, yo dando patadas; él enseguida me atrapó las manos, al mismo tiempo me amenazaba, la pierna mía derecha me quedó atrapillada con el carro y la . . . y al mismo tiempo introdujo su miembro viril en las partes." Dijo que alguna de su ropa interior resultó manchada de sangre.

Luego de los incidentes anteriores, el acusado le dijo que no contara nada porque si decía algo la mataba. "Quería que yo guiara y como no podía guiar con el estado que estaba de nervios, como yo tengo licencia, me dijo que si no sabía guiar, me quitó el guía y se dirigió a San Juan a llevarme al hospedaje." Al llegar al hospedaje abrió la puerta la perjudicada y se tiró encima de Arcadia (hija de la dueña del hospedaje) y le contó lo que le había pasado, relatándose tal y como se relaciona previamente. Que ésta le dijo: "Si tú estás toda llena de sangre y ahí ella me dijo enseguida que para que las otras compañeras no se dieran cuenta de lo que me había sucedido, me dijo que mojara la ropa."

Al otro día fue a un médico, acompañada de una amiga y éste le hizo un examen médico. Que esa noche botó mucha sangre.

Por la tarde de este día salió con Arcadia y otra compañera para Isabela y en el camino, a instancias de Arcadia, se detuvieron en Arecibo en la casa del acusado. Que en la casa de éste se quedó en el carro y las otras dos muchachas se bajaron. Que Arcadia quería hablar con el Sr. Díaz "para que le diera una excusa antes de llevarme a mi casa." Que ella no habló con el acusado ni salieron de allí juntos. Al otro día regresó a San Juan "vinimos al cuartel, nosotras tratamos de notificar en Arecibo, pero no quisieron coger el caso porque era de San Juan."

Declaró el Dr. Jordán, en esencia, que del examen de los órganos genitales de la perjudicada surgió que había tenido

recientes relaciones sexuales y que además pudo observar que el brazo izquierdo de la perjudicada presentaba un "traumatismo". Que expidió un certificado médico en esa fecha donde solamente específicaba la condición de los órganos genitales de la perjudicada.

Arcadia Cruz Cariles declaró que trabajaba en un bufete de abogados desde hacía 4 años como recepcionista. Que hace alrededor de un año que conoce a la perjudicada y que ésta se hospedaba en su casa. Que como a la una de la madrugada llegó la perjudicada a su casa "se me tiró encima y me contó lo que le había sucedido"; que la perjudicada se encontraba muy nerviosa, que le contó que "el señor Díaz la había . . . abusado de ella" y que ello fue a la mala. Que la ropa de la perjudicada se encontraba ajada y la enagua y panties rotos y manchados de sangre.

En el contrainterrogatorio declaró que el Sr. Díaz acostumbraba visitar a la señorita Vargas "semanalmente, bueno dos o tres veces a la semana, más o menos" por tres o cuatro meses. Que acostumbraban salir frecuentemente juntos, como dos veces a la semana.

Declaró, además, que no acostumbraba esperar a las muchachas del hospedaje cuando éstas salían de noche y que éstas tenían llave de la casa. Que cuando la perjudicada llegó, ella se encontraba dormida. Que acompañó a la perjudicada, al otro día, a donde una doctora pero que ésta no estaba, que luego la perjudicada fue a donde el doctor que la examinó.

Luego, en la tarde de ese día, tomaron un carro para Arecibo, a la casa del señor Díaz, que salieron expresamente para casa del señor Díaz en Arecibo. Que fueron, la perjudicada, otra amiga y ella. Que no sabía donde vivía el acusado pero que la perjudicada sabía, que ésta indicó donde era y fueron, se desmontaron del carro pero no entraron a la casa porque se encontraron con que el acusado no vivía allí sino que allí quien vivía era un hermano de éste. Que

en ese sitio les dieron la dirección del acusado. Que fueron a esa dirección, que fueron a casa de su esposa y no lo encontraron.

A preguntas del juez de instancia declaró como sigue:

"P. Oiga, joven, doña Cayita, usted mencionó que fue a una casa a Arecibo que resultó ser la casa del hermano.

R. Sí, señor."

P. ¿Esa fue la casa que la señorita Vargas le indicó como la casa del señor acusado?

R. Sí, señor.

P. Después, usted dice que fueron a otra casa y que esa resultó ser la casa del acusado.

R. Sí, señor.

P. ¿Usted vio la esposa del acusado?

R. Sí, señor.

P. ¿Usted sabía que era la esposa?

R. No señor.

P. ¿Cuándo se enteró que este señor era casado o tenía esposa?

R. En los momentos que llegué, que hablé; que hablamos con la esposa.

P. ¿Ahí es la primera vez que conoce que Luis es casado?

R. Sí, señor."

Sigue testificando que el acusado llegó al sitio y las tres lo vieron y hablaron con él, que hablaron como media hora en el patio de la casa, que la conversación fue cordial.

A preguntas también del juez de instancia declaró que en su opinión ella creía que el acusado y la perjudicada estaban enamorados. A preguntas del fiscal declaró que no los había visto tomados de la mano ni besándose.

Que luego de esta conversación con el señor Díaz fue que llamaron al hermano de la perjudicada.

■ 1.—Apunta el apelante que el testimonio de la perjudicada no es creíble porque fue suficientemente controvertido por el de Arcadia Cruz Cariles. Aunque en efecto existen algunas discrepancias entre los testimonios de estos testigos, no son de tal naturaleza que ameriten que intervengamos

con la apreciación de la prueba que hizo el jurado. Tales discrepancias no obligaban al jurado a rechazar todo el testi-monio de la perjudicada y en particular su relación de los actos delictivos realizados por el apelante en la persona de ella. *Pueblo* v. *Orellano Gómez*, 92 D.P.R. 546 (1965); *Pueblo* v. *Nazario*, 87 D.P.R. 130 (1963); *Pueblo* v. *Aletriz*, 85 D.P.R. 646–650 (1962).

■ 2–3.—Apunta el apelante que la declaración de la perjudicada no fue corroborada con prueba independiente como lo requiere la Regla 154 de las de Procedimiento Criminal. Arguye también que la instrucción del tribunal de instancia al jurado sobre la prueba de corroboración no puso al jurado en condiciones de escudriñar el testimonio ·de Arcadia Cruz Cariles para determinar si éste por sí solo conectaba al apelante con el delito y establecía, además, los elementos sin ulterior comentario. *Pueblo* v. *Dueño Maysonet*, 94 D.P.R. 706 (1967); *Pueblo* v. *Matta Ortiz*, Sentencia de 29 de junio de 1967; *Pueblo* v. *De Jesús Cruz*, 94 D.P.R. 180 (1967); *Pueblo* v. *Torres Robles*, Sentencia de 10 de marzo de 1967.

■ Las instrucciones del tribunal sentenciador contienen todas las cuestiones de derecho necesarias para la correcta ilustración e información del jurado. Dichas instrucciones fueron al efecto de que el testimonio de la perjudicada tenía que ser corroborado con otra prueba sobre dos extremos esenciales, o sea, que el hecho (la penetración) fue mediante la fuerza y la violencia, a la mala y a la fuerza, que tiene que tratar de establecer y conectar al acusado con la comisión de los hechos; que la declaración de la testigo Arcadia Cruz Cariles, de ser creída por el jurado más allá de duda razonable, sería suficiente prueba de corroboración.

■ 4.—La moción de nuevo juicio (Regla 188 de las de Procedimiento Criminal) se basó en alegada nueva prueba consistente de las declaraciones juradas de la esposa del ape-

lante y de la autora de sus días. La primera es al efecto de que la perjudicada le comunicó a la esposa que el apelante la había seducido sin decirle que era casado. Alega el apelante que el grado de rencor y tensión que había en su hogar le privó de toda comunicación con su esposa y fue después del veredicto que conoció ese hecho. La segunda informa que un miércoles de junio de 1964 vino la perjudicada a casa de la esposa del apelante donde vivía la declarante y les dijo que había tenido relaciones sexuales con el apelante porque le había dicho que era soltero; en la discusión una de las amigas de la perjudicada, para demostrar que tal cosa había ocurrido, dijo que iba a mostrar la faja que la perjudicada dejó en el automóvil del apelante; que la buscaron en el baúl y no la encontraron; que la declarante olvidó este incidente de la faja hasta que luego del veredicto y discutiendo con el abogado del apelante lo recordó; que entonces volvieron a buscar en el vehículo y encontraron la faja debajo de un asiento; que es el tipo de faja que es difícil de ponerse y quitarse y que es la misma que la perjudicada le dijo que había usado en la ocasión en que el apelante le hizo el daño; que la perjudicada al hablar de sus relaciones sexuales con el apelante nunca dijo que éste la había forzado y que ella accedió porque ella lo quería y que lo que ella quería era que se casara con ella.

La relación de hechos en la primera declaración no es prueba nueva pues el marido llegó a la casa casi enseguida de la conversación entre su esposa y la perjudicada y se enteró de lo que alegaba la perjudicada y el fin que perseguía. También tenía conocimiento el apelante de la faja; oyó el testimonio de la perjudicada sobre dicho artículo de vestir y tuvo oportunidad de comentarlo con su madre quien estaba por la Sala del tribunal habiendo sido juramentada como testigo. De manera que se justificaba la conclusión del tribunal de instancia de que la prueba en cuestión pudo haberse descubierto mediante el ejercicio de una razonable diligencia.

Concluimos, por lo tanto, que dicho tribunal no abusó de su discreción al denegar la referida moción de nuevo juicio. *Pueblo v. Aguirre Torres*, 91 D.P.R. 888 (1965) ; *Pueblo v. Pardo Toro*, 90 D.P.R. 635 (1964).

*En vista de lo expuesto, se confirmará la referida sentencia del Tribunal Superior, Sala de San Juan, dictada en este caso el 20 de octubre de 1964.*

El Juez Asociado Señor Belaval no intervino.