EL PUEBLO DE PUERTO RICO, apelado, *v.* ORLANDO RÍOS ÁLVAREZ, LUIS G. LUNA TORRES, MIGUEL A. MEDINA MALDONADO, acusados y apelantes.

*Número:* CR-79-82     *Resuelto:* 2 de febrero de 1982

*Yamil Galib Frangie, Luis Roberto Santos, Baltazar Quiñones Elías* y *Josué Flores Torres,* abogados de los apelantes; *Héctor A. Colón Cruz, Procurador General,* y *Federico Cedó Alzamora, Procurador General Auxiliar,* abogados de El Pueblo.

## SENTENCIA

Orlando Ríos Álvarez, Luis G. Luna Torres, Miguel Medina Maldonado y Pedro J. Colón Santiago, conocido por Mangó,[1] fueron acusados de asesinato en primer grado imputándoseles que en la noche del 18 de marzo de 1978 juntos y de común acuerdo, maliciosa y deliberadamente, mediante disparos de armas de fuego, dieron muerte a Luis Cruz Negrón. También fueron encausados por infracciones a los Arts. 8 y 6 de la Ley de Armas de Puerto Rico.

En juicio ante jurado, la prueba presentada por el Ministerio Público tendió a demostrar que para la fecha mencionada el acusado Orlando Ríos Álvarez se dedicaba a operar ciertos prostíbulos en el área de Isabela y que los otros tres acusados se desempeñaban en dichos negocios en diferentes labores y en ocasiones actuaban como guardaespaldas de su patrono. Ríos Álvarez le había dado en arrendamiento a la víctima, Luis Cruz Negrón, mediante convenio verbal, el prostíbulo "El Copacabana". Ríos Álvarez interesaba e insistía en formalizar el arrendamiento mediante un contrato. A tales efectos, Cruz Negrón se reunió el 10 de marzo de 1978 con Ríos Álvarez, pero no lograron un acuerdo.

Cinco días más tarde —el 15 de marzo— aproximadamente a las cuatro de la madrugada Ríos Álvarez se personó a "El Copacabana" algo disgustado y removió las patentes del negocio expedidas a su nombre, y posteriormente las estrujó con sus manos. En esa ocasión Luis Cruz, el arrendatario, no se encontraba en el negocio, que

---

[1] El acusado Pedro J. Colón Santiago, conocido por Mangó, fue asesinado antes del juicio y el tribunal archivó las acusaciones en su contra.

estaba atendido por su administrador, Francisco R. Sambolín Orlandi, quien no le opuso resistencia, porque aparentemente Ríos Álvarez había venido acompañado de uno de sus empleados, Miguel Medina, y ambos estaban armados. En esa ocasión, Ríos Álvarez dijo: "Esto hay que acabarlo de una manera o de otra" y después de tomar un trago, los dos abandonaron el lugar.

El 18 de marzo —3 días más tarde— a eso de las tres de la tarde Ríos Álvarez se presentó nuevamente a "El Copacabana", acompañado de Pedro J. Colón Santiago, pidiéndole a Luis Cruz que le pagara $2,000 que le debía, e informándole que el 23 de marzo tenía que firmar el contrato que él le había propuesto, el cual Luis Cruz había previamente rechazado. Le indicó además que si no lo firmaba tenía que dejarle el negocio; que el dueño del solar no quería que permaneciera allí; que si no dejaba el negocio se atuviera a las consecuencias. Mientras le decía esto le dio unas palmadas por el hombro. Posteriormente Luis Cruz le ordenó a su administrador que procediera a efectuar un inventario de las bebidas. Luego de efectuado el inventario el administrador procedió a cerrar el negocio.

Como a eso de las siete de la noche de ese mismo día, Ríos Álvarez volvió a "El Copacabana", encontrando el mismo cerrado, quedándose afuera y hablando con Luis Cruz. Una hora más tarde Luis Cruz le dijo al administrador que abriera nuevamente el negocio. Una vez abierto el negocio, Ríos Álvarez y Miguel Medina llegaron al lado de éste y saludaron a la esposa de Luis Cruz. Luego como a las 8:45 de la noche llegaron al negocio Luis G. Luna y Pedro J. Colón, quienes al entrar al negocio, se separaron, luego volvieron a unirse, moviéndose nerviosos, entrando y saliendo del negocio continuamente. Mientras esto ocurría, Luis Cruz no estaba en el negocio. Éste llegó luego al negocio como a las 9:15 de la noche, saliendo fuera del mismo y quedándose parado fuera de éste. Ríos Álvarez

llegó nuevamente como a las 9:30 de la noche y al llegar miró dentro del negocio.

Habiendo estado el administrador del negocio Francisco R. Sambolín viendo todo lo anterior, lo percibió como una jugada rara y decidió salir por la parte de atrás del negocio, hacia el hotel, a ver si encontraba la Policía en la carretera. Pidió la llave del auto de un empleado para usarlo, y en los momentos en que daba marcha atrás del garaje en que estaba, para entonces volver hacia el frente, miró hacia el área del negocio y vio cuando los cuatro acusados parados en línea sacaron armas de fuego y apuntaron a Luis Cruz y a una muchacha que estaba cerca de éste; inmediatamente sintió detonaciones. El testigo Sambolín se dirigió hacia Isabela, encontrando en el trayecto una patrulla de la Policía y regresando con ésta al negocio. Al arribar estaban recogiendo del piso a Luis Cruz y procedió a llevar a la muchacha al dispensario médico. Declaró además que las cuatro personas acusadas estaban debajo del alero de la puerta de entrada al hacer los disparos y que en esa área había una luz y el alumbrado del estacionamiento.

La testigo Zulma Milagros Cubillé, una de las empleadas del negocio declaró que estando ella dentro del negocio oyó varias detonaciones de arma y cuando se aproximó al lugar de donde provinieron, los cuatro acusados se le enfrentaron y que Mangó le dijo, "párate o tú también te vas". Notó que en ese momento Mangó tenía un arma negra de cañón corto en sus manos. Declaró además que todos los demás acusados tenían armas en sus manos y que luego de ese altercado se montaron en vehículos y se alejaron del sitio en dirección hacia Quebradillas.

El patólogo forense declaró que la causa de la muerte de Luis Cruz se debió a una laceración cerebral por dos heridas de bala; una en la región temporal derecha, más o menos en el área que se conoce comúnmente como la sien, y la otra en el aspecto lateral derecho, como a 4 ó 5

pulgadas del oído. Atestó además, que los disparos fueron hechos a una distancia mayor de tres pies y que el cuerpo no reflejaba otras heridas de bala; pero que presentaba erosiones superficiales en la piel. En la muñeca derecha y en el dorso de la muñeca izquierda también presentaba erosiones. En los nudillos de la mano izquierda presentaba un hematoma de una pulgada de diámetro aproximadamente. Así también tenía abrasiones en la parte posterior del hombro izquierdo.

Con respecto al hematoma encontrado por él en los nudillos de la mano izquierda, señaló que esa era una lesión típica de la que se obtiene al dar un puñetazo, que también era compatible con una caída de una persona, o sea, con la raspadura que se puede dar una persona al caer hacia atrás. Así también afirmó que el hecho de que ahí hubiese un hematoma indicaba que dicha lesión se había causado en vida, pues, mientras el corazón estuviese latiendo podía formarse. En este caso en particular determinó, por la condición de encontrar expandidos los pulmones, que se trataba de muerte súbita. Así mismo, al describir la trayectoria de los plomos dentro de la cavidad craneal, expresó que los mismos habían afectado áreas importantes del cerebro, especialmente la responsable de la actividad motora. Concluyó en su opinión que fue una muerte súbita y con toda probabilidad la persona no pudo moverse, ni tambalear tan pronto recibió dichos disparos, sino que debió haber caído en el lugar donde recibió dichos disparos.

La Defensa, por su parte, presentó varios testigos, entre ellos dos de los acusados, Ríos Álvarez y Luis Guillermo Luna. Esa prueba consistió en que los cuatro acusados estaban en el lugar de los hechos por razón de que Luis Cruz había manifestado ese día a Ríos Álvarez que le habría de entregar el negocio, por lo que sus tres empleados habían ido con el propósito de hacerse cargo del mismo y comenzar a trabajarlo. Que al llegar Ríos Álvarez

y darse cuenta de que Luis Cruz se proponía continuar operándolo, decidió marcharse y antes de irse le ordenó a sus empleados que se fueran al otro negocio de su propiedad. En ese momento el occiso les dijo "lo mejor que hacen es irse pa'l carajo". Para entonces Ríos Álvarez se había montado en su auto y se había ido, cuando se oyó una discusión entre Mangó y el occiso. La discusión continuó hasta que el occiso le dio un puño a Mangó y ambos se fueron a las manos. Tras un corto forcejeo el occiso se separó de Mangó, corrió hacia la parte trasera de su vehículo y fue a abrir el baúl, en esos momentos salió también una joven de atrás de la barra corriendo y Mangó sacó un revólver y le disparó a ambos.

Aquilatada y evaluada la prueba, el jurado rindió veredicto unánime de culpabilidad de asesinato en segundo grado e infracción del Art. 8 de la Ley de Armas. El tribunal por su parte los declaró culpables en cuanto al Art. 6 de la Ley de Armas. Les impuso a cada uno penas de 15 a 23 años por el asesinato; de 2 a 4 años por infracción del Art. 8, y 6 meses por infracción del Art. 6, a ser cumplidas concurrentemente entre sí.

No conformes, en su apelación discuten ante nos diez errores, los cuales examinaremos siguiendo nuestro propio orden y agrupándolos cuando sean similares.

I

Incidió el Honorable Tribunal a quo al permitir, por sobre la objeción de la defensa, que el Fiscal, en su turno de exposición de teoría manifestase que habría de probar que el acusado Orlando Ríos Álvarez, "se dedica a los negocios de prostíbulos en esta área", privando de ese modo a los acusados-apelantes y muy particularmente al apelante Orlando Ríos Álvarez de un juicio imparcial y justo, libre de [pre]juicios.

Asimismo incidió el Tribunal a quo al permitir a lo largo del proceso que el Ministerio Público intentase producir prueba en presencia del jurado de la supuesta explotación

de prostíbulos por parte de dicho acusado-apelante, sin que ello fuera material y pertinente al caso.

Los apelantes, a través de estos errores, señalan la violación constitucional a un juicio justo e imparcial, a base de una alegada táctica del Ministerio Fiscal —objetada por ellos— de producir prueba y llevar al ánimo del jurado que el co-apelante Ríos Álvarez explotaba prostíbulos y que los otros eran sus empleados. Aducen que no habiéndose demostrado convicciones previas, ello era improcedente.

Como sabemos, todo juicio va dirigido a la búsqueda de la verdad. Nuestro ordenamiento procesal prescribe, como garantía del derecho a juicio justo e imparcial, que la culpabilidad del acusado ha de fundarse en la prueba y en los argumentos aducidos ante el tribunal. El acusado tiene derecho a confrontarse con la prueba en su contra y a que se demuestre más allá de duda razonable su culpabilidad mediante prueba admisible conforme a las normas de relevancia, confiabilidad y certeza que la experiencia secular ha consagrado en el proceso adversativo y no por inferencias extrañas al proceso. *Pueblo* v. *Pérez Santaliz*, 105 D.P.R. 10, 13 (1976); *Pueblo* v. *Díaz Ríos*, 107 D.P.R. 140 (1978); *Pueblo* v. *Martínez Valentín*, 102 D.P.R. 492 (1974); *Pueblo* v. *Rodríguez González*, 101 D.P.R. 1 (1973); *Dávila Ramos* v. *Jefe Penitenciaría*, 89 D.P.R. 295 (1963); *Pueblo* v. *Miranda Matta*, 88 D.P.R. 822 (1963); *Reyes* v. *Tribunal Superior*, 84 D.P.R. 29 (1961).

Bajo esa óptica, el examen integral de la prueba desfilada demuestra que los errores antes apuntados no se cometieron. Difícilmente, por no decir imposible, se hubiese podido ventilar en su perspectiva circunstancial real el juicio sin que adviniera en conocimiento del jurado, como parte de la teoría del Ministerio Fiscal, la naturaleza de las actividades de Ríos Álvarez y los otros apelantes. No se trataba de información impertinente que se trajera con el fin de impugnar a algún testigo o mover indebidamente la

atención del jurado, sino que estaba íntimamente relacionada con la dinámica de los hechos. El asesinato ocurrió frente a un negocio. Una de las empleadas de dicho lugar declaró que ella y otras mujeres bailaban en bikini o desnudas sobre la barra, y que en la parte posterior había unos cuartos donde se tenían relaciones sexuales, por dinero, con amigos. Que ella lo hacía 2 ó 3 veces en la noche. Otro testigo, el administrador del negocio aceptó que éste era un prostíbulo. ¿Qué otro nombre se le podía dar al mencionado negocio y actividades?

La prueba presentada por el Ministerio Fiscal tendió a demostrar que el móvil del asesinato fue precisamente el control de dicho prostíbulo. No nos parece posible que el jurado hubiese podido juzgar integralmente la causa y entender lo que realmente había sucedido, sin enterarse de que uno de los acusados era precisamente el arrendador del prostíbulo y el occiso su arrendatario, que aquél tenía interés en recuperarlo o imponer un contrato de arrendamiento inaceptable para el segundo y que los demás acusados eran empleados del primero, con funciones, en ocasiones clásicas, de guardaespaldas. No están presentes aquí las situaciones que censuramos en los casos de *Pueblo* v. *Cruz Manfredi*, 94 D.P.R. 163 (1967); *Pueblo* v. *Dones*, 102 D.P.R. 118 (1974); *Pueblo* v. *Padilla Arroyo*, 104 D.P.R. 103 (1975); *Pueblo* v. *Álvarez Rosario*, 108 D.P.R. 112 (1978), y que han sido recogidas por las Reglas 45 y 46 de Evidencia.

## II

Asimismo incidió el Tribunal a quo al permitir que los acusados-apelantes fueran privados de un juicio imparcial y justo por la solicitud hecha por el Fiscal, en presencia del jurado, que se diera protección para la seguridad de una testigo de cargo, Zulma M. Cubillé Arroyo, que ocupaba en esos momentos la silla testifical; no habiendo el Honorable Tribunal a quo tomado acción alguna para evitar dicho perjuicio a los acusados a pesar de la solicitud de la defensa al efecto.

El incidente sobrevino durante el receso del almuerzo. Estando todavía presente el jurado, el Ministerio Fiscal solicitó protección policíaca para la testigo de cargo Zulma M. Cubillé, quien terminaba de prestar testimonio incriminatorio contra los apelantes. Los apelantes lo caracterizan como una "tónica empleada por el Ministerio Público encaminada a crear una atmósfera de hostilidad hacia los acusados mediante tácticas, por no decir trucos, de dudosa ética".

La sofisticación del crimen organizado ha llegado a tal grado que debemos reconocer que en un número sustancial de casos penales que se celebran en Puerto Rico es necesario que la Policía preste protección especial a algunos testigos de cargo antes y después de declarar, para evitar represalias a éstos. Bajo esta premisa, el Ministerio Fiscal lícitamente puede estimar necesaria tal protección, y es su deber solicitarla pronta, diligente y adecuadamente. No obstante, al así hacerlo debe evitar por todos los medios posibles que una solicitud de ese tipo, dirigida en ocasión de estar dilucidándose una causa criminal, llegue al oído de los jurados, eliminando cualquier posible especulación negativa contra los acusados. No empece a esto, si por inadvertencia o negligencia excusable se pidiera protección para un testigo de cargo en presencia del jurado, el magistrado que preside el caso debe inmediatamente llamarle la atención al Ministerio Fiscal y proceder a dar instrucciones al jurado con el fin de borrar cualquier mala impresión que ello pudiera ocasionar.

En el caso de autos se cometió el error. Sin embargo, no lo podemos considerar como decisivo o sustancial para el veredicto. Esto es así porque los apelantes elaboraron ante el jurado, como defensa, la teoría de que el crimen fue cometido por uno de sus compañeros de trabajo, Pedro J. Colón (Mangó), quien había sido asesinado antes de la fecha del juicio. Desde esa perspectiva el jurado razonablemente pudo pensar que ellos no presentaban peligro

alguno para la testigo. Adviértase, además, que resultaba de poca importancia y tardío el reclamo de protección dado el tiempo transcurrido entre la fecha de la muerte hasta la celebración del juicio y la labor que había continuado realizando la testigo, (2) que constantemente la exponía a graves riesgos.

### III

Erró el Honorable Tribunal a quo al denegar la solicitud de la defensa formulada tras la terminación de la prueba del Ministerio Público para que se ordenase al Fiscal poner a disposición de la defensa para examen el expediente del Ministerio Público o en su defecto que el propio Honorable Juez de instancia examinase el expediente con miras, en uno u otro caso, a que los acusados pudieran valerse de cualquier evidencia obrante en dicho expediente y que pudiera servir para el esclarecimiento de la verdad.

El incidente que sirve de base a este señalamiento de error tuvo lugar "[u]na vez concluida la prueba del fiscal, la defensa, en ausencia del jurado, solicitó del Tribunal que ordenase al fiscal poner a disposición de la defensa su expediente; o en su defecto, poner a disposición del Tribunal, sin intervención de la defensa, dicho expediente para que fuera éste quien lo examinase a los fines de que cualquier evidencia que pudiese aparecer en el mismo que fuese exculpatoria o que [de] alguna forma pudiese favorecer a los acusados, estuviese disponible para éstos usarla en su defensa. Habiendo mediado objeción por parte del fiscal, el Honorable Tribunal sentenciador denegó la petición de la defensa". (E.N.P., págs. 23-24.)

El esclarecimiento de la verdad como requisito indispensable en la administración de justicia penal —*Pueblo* v. *Ribas,* 83 D.P.R. 386 (1961)— no autoriza todo tipo de descubrimiento de prueba. Recientemente, en *Pueblo* v.

---

(2) La testigo declaró que para la fecha del juicio trabajaba en el negocio "Black Angus", realizando la misma labor que hacía en "El Copacabana".

*Rodríguez Sánchez,* 109 D.P.R. 243, 246–249 (1979), manifestamos:

Ha declarado este Tribunal que "[e]l derecho fundamental de un acusado en proceso criminal a defenderse lleva consigo el derecho a informarse debidamente en la preparación de su defensa". *Hoyos Gómez* v. *Tribunal Superior,* 90 D.P.R. 201, 204 (1964). El descubrimiento de prueba por el acusado tiene una fuente estatutaria en la Regla 95 de Procedimiento Criminal. En *Pueblo* v. *Tribunal Superior,* 102 D.P.R. 470 (1974), bajo normas encaminadas al adecuado balance de derechos de la sociedad y del acusado, autorizamos el descubrimiento por éste de informes, papeles y memoranda preparados por agentes del Gobierno, relacionados con la investigación del caso. Mas el descubrimiento de prueba por el acusado tiene en circunstancias propias, una base más amplia en la Carta de Derechos de nuestra Constitución. *Cf. Pueblo* v. *Hernández García,* 102 D.P.R. 506, 511 (1974); *Brady* v. *Maryland,* 373 U.S. 83; *United States* v. *Agurs,* 427 U.S. 97 (1976).

*El descubrimiento de prueba que rebasa el texto de la Regla 95 y busca apoyo en el debido proceso de ley no es recurso a invocarse livianamente. Está muy lejos de ser patente de corso que en forma indiscriminada permita la intrusión en los archivos de fiscalía, ni que facilite al acusado cuanta evidencia pueda relacionarse con el caso criminal. No basta para activar el remedio la probabilidad de que el jurado o el juez de conocer tal prueba hubiesen rendido un fallo distinto. La protección constitucional se da en situación que implica corrupción de la función depuradora de la verdad que es la esencia procesal del juicio. En tal extremo es responsabilidad del Estado en su obligación de proveer un juicio justo bajo la cláusula de debido proceso de ley, y aun sin mediar solicitud de la defensa, revelar evidencia exonerante en su poder o vicios de falsedad en su prueba que de permanecer ocultos e ignorados sofocarían la verdad en la sala de justicia. Baste recordar que el propósito del juicio no es obtener una convicción sino la depuración de hechos en búsqueda de la verdad.*

Cuando el acusado la solicita, es obligación del fiscal revelar evidencia del Estado sin que medien las circuns-

tancias de exigencias que le compelen a tomar la iniciativa para proteger la legalidad del juicio. A moción de la defensa, "si el objeto de la solicitud es material [relevante por su substancia]; e indudablemente si hay base sustancial para invocar que existe materialidad, lo razonable es exigir del fiscal que responda bien suministrando la información o sometiendo el problema al juez". *United States* v. *Agurs*, 427 U.S. 97, 106 (1976). El concepto de materialidad, y la obligación del fiscal de revelar ante la solicitud de la defensa, han de ser consubstanciales con el eminente interés en asegurar que toda evidencia significativa que tienda a establecer inocencia sea presentada al juzgador de los hechos. A esa conclusión llegamos, aunque por fundamentos procesales, en *Pueblo* v. *Tribunal Superior*, supra.

> . . . *El descubrimiento de prueba en el proceso criminal debe enancharse hasta donde permita la competencia entre el interés del acusado en su defensa y la confidencialidad de determinados documentos y expedientes, moderada por una discreción judicial que habrá de decidir si la utilidad que para la defensa representa esa prueba supera los intereses del Estado y de terceras personas a cuya protección va dirigida la norma de secretividad.*

.        .        .        .        .        .        .        .

No resta dignidad al fiscal demandar y exigir de los funcionarios correspondientes la evidencia cuyo descubrimiento ha ordenado el tribunal. Aun cuando el abogado del Pueblo de Puerto Rico ha de procesar al acusado con determinación y vigor "debe una lealtad primaria al interés superante de su cliente en que se haga justicia. El fiscal es el servidor de la ley cuyo objetivo dual es que el culpable no escape ni el inocente sufra". (Énfasis nuestro.)

A la luz de estos pronunciamientos debe medirse el planteamiento de los apelantes. Primeramente, en este caso tuvieron y utilizaron adecuadamente el descubrimiento de prueba antes del juicio, según estatuido en la Regla 95 de Procedimiento Criminal. A tal efecto, con fecha del 23 de junio y del 2 de agosto de 1978 radicaron mociones bajo dicha regla, solicitando entre otras cosas, en la del 2 de agosto "[c]opia de cualquier evidencia o información per-

tinente a la inocencia de los acusados y si fuere verbal; se ponga en conocimiento de los comparecientes". El tribunal de instancia, para resolver si procedía lo solicitado, celebró una vista y en la misma, luego de oír a las partes, determinó que el Ministerio Fiscal no poseía tal evidencia.

En vista de lo anterior, entendemos que el tribunal de instancia no abusó de su discreción al negar lo solicitado por los apelantes. Adviértase, sin embargo, que este pronunciamiento no implica que una vez terminada la presentación de la prueba el Ministerio Fiscal venga obligado a entregar su expediente al magistrado que preside para que éste haga una expedición de pesca en busca de evidencia exculpatoria. Simplemente destaca el deber del Ministerio Fiscal, sin importar la etapa de los procedimientos, de poner a la disposición de un acusado todo tipo de evidencia tendente a demostrar su inocencia.

IV

Las sentencias apeladas son el resultado del manifiesto error en la apreciación de la evidencia desfilada y como tal son contrarias a derecho.

Es principio fundamental en nuestro Derecho penal que la culpabilidad del acusado debe ser probada más allá de duda razonable. La prueba, además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación. La determinación de si se ha probado la culpabilidad más allá de duda razonable es, pues, revisable como cuestión de derecho. Cuando no se cumple con este requisito la sentencia no puede sostenerse. *Pueblo* v. *Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1974); *Pueblo* v. *Meléndez Rolón*, 100 D.P.R. 734 (1972); *Pueblo* v. *Bonilla Medina*, 99 D.P.R. 128 (1970); *Pueblo* v. *Rodríguez González*, 99 D.P.R. 904, 910 (1971); *Pueblo* v. *Serrano Nieves*, 93 D.P.R. 56, 59 (1966); *Pueblo* v. *Malavé Sánchez*, 95 D.P.R. 395 (1967); *Pueblo* v. *Toro Rosas*, 89 D.P.R. 169 (1963);

*Pueblo* v. *Ortiz Morales*, 86 D.P.R. 456 (1962); *Pueblo* v. *Viana*, 41 D.P.R. 413, 416 (1930); *Pueblo* v. *Cruz*, 58 D.P.R. 33 (1941) y *El Pueblo* v. *Vilar*, 17 D.P.R. 1054, 1057 (1911).

Un examen de la exposición narrativa, así como de la transcripción parcial de la evidencia que contiene la declaración del acusado Luna Torres, basta para precisar las dos versiones que de los hechos imputados en la acusación tuvieron ante sí los juzgadores. La del Ministerio Fiscal tendió a demostrar que los cuatro acusados, a poca distancia, le dispararon a la víctima con sendas armas de fuego, quien se encontraba recostado de espaldas a un vehículo de motor y frente a sus alegados agresores. La de los apelantes, por otro lado, fue en el sentido de que la muerte fue causada por Pedro J. Colón (Mangó) y no ellos. Los juzgadores de instancia creyeron como cierta la versión del Ministerio Fiscal. A ellos correspondía dirimir y darle peso a los testimonios y contradicciones de algunos testigos respecto a detalles no esenciales. *Pueblo* v. *Villalongo Torres*, 102 D.P.R. 574 (1974). No están presentes en el caso de autos los hechos que este Tribunal sancionara en *Pueblo* v. *Carrasquillo Carrasquillo*, supra. Es bien sabido que los jueces de instancia y los jurados son quienes normalmente están en mejores condiciones de aquilatar la prueba, ya que gozan de la oportunidad de ver y escuchar a los testigos. Así, como regla general, la apreciación que hagan de la prueba nos merece gran respeto. *Pueblo* v. *Nevárez Virella*, 101 D.P.R. 11 (1973).

No habiendo en este caso parcialidad o error manifiesto en la apreciación por el jurado de la prueba presentada ante él no debemos alterar su dictamen. *Pueblo* v. *López Ramos*, 96 D.P.R. 699, 703 (1968); *Pueblo* v. *Iturrino De Jesús*, 90 D.P.R. 706, 712 (1964); *Pueblo* v. *Aponte González*, 83 D.P.R. 511, 520 (1961).

## V

Erró el Tribunal a quo con vista a todas las circunstancias del caso al denegar todas las solicitudes de la defensa de que

se practicase una inspección ocular del supuesto lugar de los hechos.

Al concluir el testimonio del agente del N.I.C. José A. Vargas, testigo de la Defensa, ésta solicitó del tribunal una inspección ocular del lugar de los hechos. Al pedido se opuso el Ministerio Fiscal, alegando en primer término que la misma era prematura y posteriormente que las circunstancias del lugar habían variado, por lo que dicha inspección no habría de arrojar luz al jurado, sino que posiblemente los confundiría. La Defensa, por su parte, sostuvo que con adecuadas instrucciones sobre qué cosas tomar en cuenta o no, la localización de las estructuras de concreto que formaban ese conjunto, y el beneficio de las medidas tomadas por el referido agente —las cuales podrían marcarse a base de los hallazgos principales de la investigación realizada en el sitio por el funcionario, independientemente del tiempo transcurrido— se hacía apropiada la inspección. El tribunal no accedió a la inspección ocular. (E.N.P., pág. 27.)

Recientemente, en *Pueblo* v. *Pagán Díaz*, 111 D.P.R. 608, 617 (1981) dijimos:

> Sabido es que las inspecciones oculares no tienen otro propósito que auxiliar al jurado o al juez a apreciar correctamente la prueba que haya desfilado o que se proponga desfilar. *Pueblo* v. *Cruz*, 60 D.P.R. 116 (1942). La actual Regla 134 de Procedimiento Criminal, en lo pertinente dispone que "Cuando en la opinión del tribunal fuere conveniente que el jurado examine el lugar en que fue cometido el delito, o en que hubiese ocurrido cualquier otro hecho esencial, podrá ordenar que se conduzca al jurado" a dicho sitio para una inspección ocular.

> Ciertamente el ordenar una inspección ocular es una facultad que cae dentro de la sabia discreción del Tribunal. El discernimiento judicial que debe preceder tal determinación exige la evaluación inicial de dos condiciones: (a) el tribunal debe constatar y velar porque el lugar a ser examinado se halle sustancialmente en las mismas condiciones que cuando se cometió el delito —*Pueblo* v. *Díaz*

*Cintrón*, 91 D.P.R. 146 (1964); *Pueblo* v. *Cruz*, supra; *Pueblo* v. *Sarria*, 57 D.P.R. 882 (1941); y *Pueblo* v. *Goitía*, 41 D.P.R. 941 (1931)—; y (b) debe medir la necesidad real, su pertinencia y el esfuerzo que ello conlleva. Como medio de prueba —*Emanuelli Fontánez* v. *Emanuelli Suro*, 87 D.P.R. 380 (1963)— la inspección puede ser pertinente, pero su valor probatorio de poca significación en relación con cualesquiera de los siguientes factores: peligro de causar perjuicio indebido, probabilidad de confusión, desorientación del jurado, dilación de los procedimientos o innecesaria presentación de prueba acumulativa. Regla 19 de Evidencia.

A la luz de estos principios, veamos los méritos de la solicitud de inspección ocular. El testigo que motivó dicho pedido tan sólo manifestó que de trasladarse al lugar de los hechos con ayuda de un croquis y con las medidas que había tomado podría fijar en el lugar de los hechos el sitio específico en que se encontraban las manchas de sangre, así como también donde había encontrado un sostén de mujer, la cadena y la cajita de goma de mascar.

A base de esa sola declaración entendemos que el tribunal no incurrió en error al negar la inspección. En primer lugar las circunstancias del lugar de los hechos al momento del juicio habían variado drásticamente. "El Copacabana", escenario principal, se había quemado en un incendio que tuvo lugar la semana siguiente al incidente en que murió Luis Cruz. (E.N.P., pág. 9, declaración del testigo Francisco R. Sambolín.) Y segundo, albergamos serias reservas sobre si dicha inspección hubiese servido el propósito de orientar al jurado. No sólo habían variado los signos físicos externos del sitio, sino que estarían sujetas a la realización de unas medidas.

## VI

Erró el Honorable Tribunal a quo al denegar transmitir al jurado instrucciones que fueran debidamente solicitadas por la defensa.

En su oportunidad la Defensa solicitó ciertas instrucciones especiales al jurado. Las mismas las podemos

dividir en dos grupos. La primera instrucción fue la siguiente:

Las circunstancias de que 2 o más personas se encuentren juntas en la fecha, hora y lugar en que una de ellas comete un delito por sí sola no justifica que se responsabilice por dicho delito a aquellos que estaban en su compañía allí y entonces.

Los apelantes aducen que esta instrucción está sostenida por lo establecido en el caso de *Pueblo* v. *Zengotita,* 89 D.P.R. 870 (1964). No les asiste la razón. En *Pueblo* v. *Zengotita* se acusó a tres individuos de un robo, la prueba desfilada demostró que solamente dos de ellos fueron quienes lo cometieron, ya que el acusado Pérez Méndez tan solo por casualidad o circunstancialmente se encontraba presente en el lugar de los hechos y al momento de suceder éstos, sin tener ninguna participación en el mismo, ni haber conspirado para cometerlo.

Manifestamos:

No hay base para alterar la convicción de los coacusados Zengotita y De Jesús. Por otra parte, la única declaración que conectó al coacusado Pérez Méndez fue la de Merced y Merced declaró que Pérez Méndez no atacó. Si se acepta la admisión de Pérez en el Cuartel al efecto de que él estaba en el sitio, hay que aceptar también la parte exculpatoria de que no hizo nada. La convicción de Pérez Méndez podría sostenerse si el récord demostrara que el robo se debió a un plan preconcebido con tal fin y que Pérez por lo tanto formaba parte de una conspiración. No hay base suficiente en el récord para dejar establecida tal conspiración previa. El propio López dijo que nada indicaba que los acusados estuvieran en un plan delictivo al montársele en el carro, y por otra parte el récord señala que pudo haber habido un móvil para la agresión al perjudicado por las relaciones de éste con la querida o mujer de De Jesús, único de los acusados que ordenó ir hacia el Hotel Intercontinental, ordenó que se detuviera el vehículo al alcanzar al del perjudicado y el único que manifestó que él tenía algo que decirle a éste. En efecto, el testigo López Merced dijo que no

vio a los atacantes cogerle nada al perjudicado. La Sala sentenciadora aparentemente creyó al perjudicado sobre este extremo.

En *Pueblo* v. *Aponte*, 83 D.P.R. 511 (1961), el Juez Asociado Sr. Blanco Lugo expresó (pág. 519):

Distinto al caso de *Aponte*, en el de autos no hay prueba suficiente para concluir en derecho la existencia de un plan o conspiración previa para cometer robo.

"La mera presencia durante la comisión de un delito no es suficiente por sí sola para sostener una convicción, [citas]; pero este hecho puede considerarse conjuntamente con las otras circunstancias que rodean el hecho delictivo a los fines de la determinación de responsabilidad, *People* v. *Carlson*, 2 Cal. Rptr. 117 (1960). No es indispensable, pues, que el acusado ejecute personalmente el acto delictivo y basta con su presencia pasiva, siempre que su responsabilidad como coautor pueda establecerse por actos anteriores, o como el resultado de una conspiración en que participó, [citas], o de un designio común, [cita]. Bajo los hechos reseñados anteriormente forzoso es concluir que tanto Aponte González como Colón Peraza responden como coautores no obstante su participación pasiva en el hecho físico del despojo violento de que fue víctima el perjudicado." Págs. 874–875.

Finalmente absolvimos al apelante Pérez Méndez.

En el caso de autos no están presentes dichas circunstancias y, por ende, resultaba improcedente transmitir dichas instrucciones. La prueba desfilada estableció que uno de los tres apelantes había amenazado a la víctima, que algunos de los apelantes llegaron al lugar de los hechos en compañía de quien ellos alegaban asesinó a Luis Cruz. Se les vio sacar sus armas y disparar. Uno de ellos admitió que condujo la guagua en que se fueron del lugar en compañía del que alegadamente acababa de dar muerte a la víctima y herir a una joven.

Las demás instrucciones solicitadas giraban en torno al delito de homicidio involuntario. En sus instrucciones al jurado el juez debe incluir todos los puntos de Derecho que bajo cualquier teoría razonable puedan estar envueltos en

las deliberaciones, siempre, desde luego, que la prueba lo justifique. *Pueblo* v. *Del Valle,* 91 D.P.R. 174 (1964); *Pueblo* v. *Jiménez,* 78 D.P.R. 7 (1955); y *Pueblo* v. *Burgos,* 76 D.P.R. 199 (1954). El hecho de que alguna evidencia presentada no sea del todo creíble no autoriza la negativa a una instrucción sobre tal aspecto. No importa lo increíble que parezca la prueba del acusado, éste tiene derecho a una instrucción basada en su prueba ante la posibilidad de que sea creída por el jurado. Es el deber del tribunal instruir al jurado sobre todo delito que esté incluido en el delito imputado y que la evidencia tienda a probar. *Pueblo* v. *Tufiño Cruz,* 96 D.P.R. 225, 230 (1968); *Pueblo* v. *Gagot Mangual,* 96 D.P.R. 625, 626 (1968); *Pueblo* v. *Negrón Vélez,* 96 D.P.R. 419 (1968).

La prueba presentada durante el juicio no justificaba instrucciones de homicidio involuntario. La prueba de los acusados iba orientada a establecer que no habían tenido participación alguna en la muerte de Luis Cruz y que su autor había sido Pedro J. Colón (Mangó). Se declaró expresamente que el acusado Ríos Álvarez no se encontraba en el lugar de los hechos al momento de suceder la muerte. No habiendo, según ellos, participado en la comisión del delito de asesinato, tampoco podían haber cometido el de homicidio involuntario, ya que el último está comprendido en el primero. *Pueblo* v. *Gagot Mangual,* supra; *Pueblo* v. *Negrón Vélez,* supra; y *Pueblo* v. *Cestau Moreno,* 91 D.P.R. 755 (1965).

## VII

Incidió el Honorable Tribunal a quo al permitir al Fiscal que en el curso de su repregunta al acusado Luis G. Luna Torres le preguntase por qué no había manifestado en el Cuartel de la Policía la noche de los hechos y cuando fue arrestado, lo que en el juicio narraba desde la silla de los testigos.

Asimismo erró el Honorable Tribunal a quo al permitir al Fiscal, por sobre la objeción de la defensa en su informe al

jurado que comentase el silencio de dicho acusado, Luis G. Luna Torres, la noche de los hechos en el Cuartel de la Policía en ocasión que fuera llevado bajo arresto.

Incidió el Honorable Tribunal a quo al no decretar un *"mistrial"* con vista a lo planteado en los dos señalamientos de error inmediatamente precedentes y/o al no transmitir cuando menos instrucciones al jurado desaprobando dicha táctica del Fiscal e instruyéndole en cuanto a que no considerasen la evidencia así obtenida ni las manifestaciones que al efecto hiciera el Fiscal en su informe.

Estos tres señalamientos de error tanto los apelantes como el apelado los discuten en conjunto. Los examinaremos de igual forma por girar en torno al derecho constitucional de todo acusado de permanecer callado en el curso del proceso investigativo y de que su silencio no podrá tomarse en su contra ni comentarse en el juicio.

La primera situación que motivó estos señalamientos de error surgió cuando estaba declarando el acusado Luis G. Luna Torres. En el interrogatorio directo, según señalamos previamente, declaró que quien había cometido el asesinato había sido Mangó y que los otros tres acusados no tuvieron nada que ver con los hechos. En el contrainterrogatorio, efectuado por el Ministerio Fiscal, al acusado contestar unas preguntas con relación a lo acaecido después de ocurrir la muerte, surgió el siguiente altercado:

P. ¿Y Miguel se fue a trabajar en los cuartos de atrás?

R. Posiblemente se fuera a trabajar.

P. No lo sabe usted entonces, si no lo sabe usted me lo dice.

R. No lo sé.

P. No lo sabe. Bien, señor Luna, entonces ¿usted ha presenciado cuando una persona le entra a tiros a otra?

R. Sí, señor.

P. ¿Correcto?

R. Sí, señor.

P. ¿Y se va a trabajar a La Balanza y no le notifica a la policía que una persona le entra a tiros a otra?

R. Eso no fue conmigo.

P. No fue con usted es la contestación. Pero ¿usted estaba allí?

R. Sí, señor.

P. ¿O sea que usted no intervino con la policía con relación a los hechos?

R. *A mí me arrestaron.*

P. *¿Lo arrestaron?*

R. *Sí, señor.*

P. ¿Pero le dijeron que era con relación a estos hechos que lo estaban arrestando?

R. Sí, con relación a su muerte.

P. ¿No le dijeron con relación a quién? ¿La policía no le dijo a usted de quién se trataba la muerte?

R. En el momento del arresto no.

P. ¿Cuándo se lo dijo?

R. *Cuando me llevaron al cuartel.*

P. *Al cuartel, usted no le dice a la policía: "un momento, yo vi"...*

LIC. GALIB:

*Objeción.*

HON. JUEZ:

*Con lugar la objeción de la defensa.*

LIC. GALIB:

Objeción con una advertencia a los señores del jurado. Que se retiren los caballeros del jurado.

HON. JUEZ:

La pregunta el testigo no la ha contestado.

FISCAL ROMÁN:

Por vía de reconsideración, V[uestro] H[onor].

HON. JUEZ:

Compañero de la defensa y compañeros Fiscales, acérquense adelante.

HON. FISCAL ROMÁN:

P. *La pregunta es ¿A usted lo detuvieron con relación a estos hechos?*

R. *Sí, señor.*

P. *¿Entonces lo llevaron dónde?*

R. *Al cuartel de la policía.*

P. *Ahora, usted no tenía que ver nada con relación a estos hechos, ¿eso es cierto o no es cierto?*

R. *No, señor.*

P. *Entonces le pregunto si usted le informó a la policía: "un momento, quien disparó allí fue Mangó, yo no tuve nada que ver con esos hechos, ni Miguel, ni Orlando tampoco".*

R. *Bueno, no se lo dije.*

P. *¿No se lo dijo?*

LIC. GALIB:

*V[uestro] H[onor], vamos a solicitar un mistrial en este caso.*

HON. FISCAL ROMÁN:

Lo que tiene que haber hecho . . .
(Habla el Fiscal Román, Fiscal Muñiz, Lic. Galib, Juez, pero no se entiende)
era pedir que se retirara el jurado.

HON. JUEZ:

El Tribunal en este momento va a permitir que el jurado se retire en este momento, salga de sala, las mismas advertencias que les hemos hecho desde el principio como jurados en esta causa, no deben conversar ni comentar entre sí ni con ninguna otra persona acerca de

ningún particular relacionado con este proceso ni formar, ni expresar juicio sobre el mismo hasta que estas causas criminales hayan sido sometidas definitivamente ante vuestra consideración para deliberación. Pueden retirarse. Bien, el récord está disponible para la defensa. (Énfasis nuestro.) Transcripción del contrainterrogatorio de Luis G. Luna Torres, págs. 43–46.

Después de este incidente, ambas partes, tanto la Defensa como el fiscal expusieron sus respectivos argumentos. La Defensa señaló que el comentario del fiscal era al silencio del acusado, lo cual no podía hacer, y que procedía decretar un *mistrial*. El fiscal, por su parte, entre otras cosas señaló:

*. . . si el Lic. Flores que es el que representa al acusado Luna, no hubiese sentado a ese co-acusado, el fiscal no puede comentar el silencio, esa es la norma jurídica . . .* si no lo hubiese sentado pero el compañero Flores luego de discutir con su cliente optó por sentar en la silla de los testigos a su representado. Ahora se le quita la etiqueta de acusado y es testigo. ¿Cómo se trata a un acusado que se sienta? La jurisprudencia y las reglas: "a un acusado que se sienta en la silla a declarar se trata como a un testigo cualquiera". Pregunta: ¿Se puede impugnar por omisión de cosas sustanciales a un testigo que se sienta? Sí, se puede impugnar.

Pregunta: ¿Se puede impugnar a un acusado que se sienta por omisiones de cosas sustanciales? Se puede impugnar.

El tribunal declaró sin lugar la solicitud de que se disolviera el jurado. El otro incidente que motiva estos señalamientos de error tuvo lugar durante el informe del fiscal al jurado. A la parte pertinente el fiscal se manifestó:

Hon. Fiscal Román:

Con la venia del Tribunal y los caballeros del Jurado, durante estos días hemos estado aquí. Es el testigo Luna, el mesero de Ponce que vino una semana antes de los hechos, el que no sabía si en La Balanza trabajaban mujeres, el que no sabía si los cuartos daban atrás o lejos,

los cuartos de La Balanza. Es ese el que como que aquí no ha pasado nada supuestamente de un delito, digo, de un tiroteo, él dijo que vio que Mangó le disparó a Cruz Iglesias [*sic*] y como el que se chupa un limberg [*sic*] de coco se fue a trabajar para La Balanza. *A preguntas del Fiscal: ¿Notificó usted la policía? No, señor. Le pregunto a ustedes ¿es esa la situación típica, es esa la actuación correcta de un ser humano, es eso creíble? El hombre al sentarse* . . .

LIC. GALIB:

Queremos señalar entonces como objeción que el compañero está comentando indebidamente lo que dijo o dejó de decir a la policía el acusado la noche de los hechos, como una objeción con solicitud de instrucción.

HON. JUEZ:

Bien, adelante el señor Fiscal. (Énfasis suplido.)

Las instrucciones solicitadas tanto para la primera situación como para la segunda nunca fueron suministradas.

Un análisis objetivo de los comentarios del fiscal refleja que su teoría, aunque errónea, era que una vez se sentó el acusado a declarar sobre su silencio el día del arresto, podía ser comentado con propósito de impugnarlo por constituir ello una omisión sustancial. Aparentemente dicho funcionario pensó estar así autorizado amparándose en lo resuelto en *Pueblo* v. *Archeval,* 74 D.P.R. 512 (1953); *Pueblo* v. *Cortés del Castillo,* 86 D.P.R. 220 (1962); y *Ruiz* v. *San Juan Racing Assn.* 102 D.P.R. 45 (1974). En *Pueblo* v. *Archeval,* a las págs. 515–516, reconocimos que "[u]na vez que el acusado se sienta a declarar, se convierte en un testigo como cualquier otro y está sujeto a las mismas reglas y procedimientos en cuanto a la pregunta y repregunta que cualquier testigo". Se trata de una norma general que no puede utilizarse en forma tal que constituya un comentario al silencio del acusado. Así lo aclaramos en *Pueblo* v. *Esquilín París,* 96 D.P.R. 415 (1968), en que se

radicó acusación por violación. La defensa del acusado consistió allí en la coartada de que ese día y en los momentos en que estaba ocurriendo lo que relataba la perjudicada, él visitaba en unión de su esposa, a la madre de ésta. Para establecer su defensa el acusado allí declaró. En el contrainterrogatorio el fiscal *insistió una y otra vez* en si cuando fue llevado al cuartel para la investigación informó a la detective dónde se encontraba el día de los hechos. Además *recalcó* que durante la vista preliminar no levantó la defensa de coartada. Al revocar la sentencia y ordenar nuevo juicio dijimos:

> Además de constituir un comentario al silencio del acusado el fiscal *trató de desacreditar la defensa de coartada*, precisamente con el silencio que el acusado mantuvo durante la vista preliminar . . . .
>
> Y cuando posiblemente al juez se le ofrece la oportunidad de corregir ese error mediante las instrucciones solicitadas por la defensa, se niega a transmitirlas. La Constitución es terminante cuando en la Sec. 11 de la Carta de Derechos dispone que "el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra". Y en *Pueblo v. Álvarez Trinidad*, 85 D.P.R. 593 (1962) expresamos que esa disposición constitucional protege a la persona desde el momento del arresto. (Énfasis nuestro.) Págs. 418–419.

No estando conforme con ese dictamen el Procurador General solicitó reconsideración alegando que erramos al aplicar el derecho a los hechos. *Pueblo v. Esquilín París*, 98 D.P.R. 505, 509–511 (1970). Reiteramos nuestra decisión con este pronunciamiento:

> No estuvo justificado el fiscal en *hacer resaltar* en su contrainterrogatorio el hecho de que durante la investigación ni en la vista preliminar el acusado no interpusiera la defensa de coartada. No se justificaba que el fiscal hiciera referencia a su silencio durante la vista preliminar, por el hecho de que optó por declarar en su propia defensa en el día del juicio.
>
> Invocando a *Pueblo v. Archeval*, 74 D.P.R. 512, 515 (1953)

donde expresamos que "una vez que el acusado se sienta a declarar, se convierte en un testigo como cualquier otro y está sujeto a las mismas reglas y procedimientos en cuanto a la pregunta y repregunta que cualquier otro testigo", el Procurador sostiene que el fiscal podía inquirir del acusado el porqué no había presentado como defensa la coartada durante la investigación del caso y al celebrarse la vista preliminar.

Antes de considerar la aplicabilidad de la disposición constitucional es pertinente apuntar que la Regla 74 de las de Procedimiento Criminal de 1963 dispone que el acusado no está obligado a notificar al fiscal que su defensa es una coartada hasta diez días antes de la celebración del juicio. El acusado cumplió con la Regla notificando al fiscal en tiempo.

También debe tenerse en cuenta que la regla invocada por el Procurador es de aceptación general y que en la jurisdicción federal tiene vigencia según está expuesta en *Caminetti* v. *United States*, 242 U.S. 470 (1917).

El precepto constitucional que garantiza a todo ciudadano el derecho a no ser testigo en su contra se remonta al Siglo XVI, Corwin, *The Supreme Court's Construction of the Self-Incrimination Clause*, 29 Mich. L. Rev. (1950). Es una garantía para proteger al inocente. De ahí que el Tribunal Supremo de los Estados Unidos por voz del Juez Harlan se expresara así en *Grunewald* v. *United States*, 353 U.S. 391 (1957) a la pág. 421:

"No necesitamos detenernos mucho para reiterar nuestra posición, así como sostuvieron las dos cortes de instancia, de que no puede surgir ninguna implicación de culpabilidad de la invocación por Halperin, de su privilegio a la Quinta Enmienda hecho ante el gran jurado. Un reciente reexamen de la historia y significado de la Quinta Enmienda ha enfatizado nuevamente que una de las funciones básicas del privilegio es el proteger al inocente. Griswold, The Fifth Amendment Today, 9–30, 53–82. 'Muchos, aun aquellos con mejor conocimiento, miran a este privilegio como un refugio para los malhechores. También presumen rápidamente que aquellos que lo invocan son o culpables del crimen o cometen perjurio al invocar el privilegio'. *Ullman* v. *United States*, 350 U.S. 422, 426. Ver también *Slochower* v. *Board of*

*Higher Education*, 350 U.S. 551, cuando, en el mismo término, esta Corte dijo a las páginas 557-558: 'El privilegio sirve para proteger al inocente que de otra forma podría ser atrapado por circunstancias ambiguas.' "

Finalmente concluimos "que la regla invocada por el Procurador no puede utilizarse para subvertir derechos garantizados por la Constitución. Y que por el hecho de que el acusado declare en su propia defensa en el juicio no renuncia retroactivamente a la protección constitucional en que se ha amparado durante los procedimientos anteriores al juicio". Pág. 516.

Los señalamientos expuestos derrotan la tesis del fiscal de instancia. Cabe señalar además que esta regla general ha sufrido ciertas modificaciones. *Pueblo* v. *Álvarez Rosario*, supra; *Pueblo* v. *Padilla Arroyo*, supra; *Pueblo* v. *Dones*, supra.

El otro fundamento del fiscal, como señalamos previamente, era en el sentido de que al acusado se le podía impugnar por haber incurrido en una omisión sustancial.

En *Pueblo* v. *Cortés del Castillo*, supra, a la pág. 225, reconocimos que "[s]e acepta que procede impugnar la veracidad de un testigo por haber omitido éste en ocasión anterior hacer manifestaciones sobre un hecho esencial relacionado con el asunto bajo investigación [citas omitidas]. Esto es así a pesar de que en las disposiciones legales que autorizan la impugnación de testigos [citas omitidas] se establece como requisito para impugnar la veracidad de un testigo, el haber hecho manifestaciones incompatibles o que no coinciden con lo declarado durante el juicio. [Citas omitidas.] Ahora bien, es requisito que se trate de un hecho esencial. [Citas omitidas.] Y que, como sostiene Wigmore, hubiera sido natural que el testigo hiciera la manifestación cuando declaró por primera, vez. [Citas omitidas.] Si era natural que expusiera el hecho omitido y no lo hizo, aunque no se le hubiera preguntado específicamente, puede usarse para impugnar su testimonio en

corte". A igual conclusión llegamos en *Ruiz* v. *San Juan Racing Assn.*, supra, pág. 51. Véanse también las Reglas 44B(5) y 47 de Evidencia.

En resumen, los casos *Cortés del Castillo* y *Ruiz* no son de aplicación al de autos, pues en el primero sostuvimos que *a un testigo de cargo* se le podía impugnar por una omisión sustancial, y en el de *Ruiz* se trataba de impugnar a la parte demandante en un caso civil. Ninguno de los dos casos giraba sobre la impugnación de un acusado. Además, en *Cortés del Castillo* resolvimos que la omisión debería ser de tal naturaleza que hubiera sido natural que el testigo hiciera la manifestación cuando declaró por primera vez. En el que nos ocupa, el acusado Luna Torres no efectuó ninguna manifestación al ser arrestado. Al así actuar debemos reconocer que hizo uso de su derecho constitucional a permanecer en silencio. *Pueblo* v. *Chaar Cacho*, 109 D.P.R. 316 (1980); *Pueblo* v. *Tribunal Superior*, 97 D.P.R. 199 (1969); *Pueblo* v. *Guadalupe Rosa*, 94 D.P.R. 190 (1967); *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765 (1965); *Miranda* v. *Arizona*, 384 U.S. 436 (1966); *Escobedo* v. *Illinois*, 378 U.S. 478 (1964); *Hoffman* v. *United States*, 341 U.S. 497 (1951). [3]

[3] En la jurisprudencia más reciente, en *Doyle* v. *Ohio*, 426 U.S. 610 (1976), encontramos un caso muy parecido al de aquí. Se acusó a Doyle y a Wood de haber efectuado una venta de marihuana. Los casos se vieron por separado. En ambos los acusados ocuparon la silla testifical y admitieron la mayoría de los hechos, excepto quién había efectuado la venta a quién. Alegaron que la Policía le había fabricado el caso. Se alegó que el agente le había tirado el dinero de la aparente venta en su carro y que ellos lo estaban buscando para saber de qué se trataba cuando fueron arrestados. El fiscal en el contrainterrogatorio le preguntó en forma *extensa* e *inquisitoria* a cada uno por qué no le habían contado la historia de la fabricación al agente Beaner al ser arrestados.

En ambos procesos la Defensa presentó oportunamente objeciones a esa línea de contrainterrogatorio, pero fueron denegadas. Ante el Tribunal Supremo de Estados Unidos, el Estado alegó que la acción del fiscal era necesaria, pues había habido una discrepancia de versiones y podía inferirse que los acusados estaban fabricando la historia, tal vez para que concordara con los hechos del Estado.

Ante esos argumentos el Tribunal manifestó diciendo: "[n]o empece la importancia del contrainterrogatorio, hemos concluido que la decisión *Miranda* compele al rechazo de la proposición del Estado. Las advertencias ordenadas por ese caso, a manera de medio profiláctico para proteger los derechos en la Quinta

Sería irrazonable que al acusado se le concediera el derecho a no declarar al momento de ser arrestado y luego se le tachara su credibilidad en el proceso por haber ejercido ese derecho. Hace aproximadamente veinte años, en *Pueblo* v. *Álvarez Trinidad*, 85 D.P.R. 593, 598 (1962), reconocimos que "el silencio del arrestado al enfrentarse a la inculpación de un copartícipe, cómplice, o persona particular durante la investigación criminal o durante el proceso criminal no debe tenerse en cuenta, ni comentarse en su contra, bien se considere como una admisión por adopción, admisión tácita o excepción a la prueba de referencia por formar parte de nuestra garantía constitucional ante la autoincriminación, y es el deber de nuestros Tribunales no admitir tal prueba y el deber de nuestros Fiscales abstenerse en absoluto, durante el proceso, de hacer cualquier comentario que dé margen a una inferencia sobre una posible admisión por silencio". Y posteriormente, en *Pueblo* v. *Perales Figueroa*, 92 D.P.R. 724, 726–727 (1965):

> El silencio del acusado por su destino —eficaz instrumento para la garantía de la presunción de inocencia y del privilegio de no incriminarse— es digno del más profundo respeto; su invasión no está permitida a nadie; no se debe permitir cualquier intento de convertirlo en factor o ele-

---

Enmienda, ver, *Michigan* v. *Tucker*, 417 U.S. 433, 443–444 (1974), requieren que se advierta de inmediato a la persona arrestada, que tiene derecho a permanecer callada, que cualquier cosa que diga podrá usarse en su contra y que tiene derecho de consultar a un abogado designado o contratado, antes de someterse a interrogatorio. El silencio como resultado de estas advertencias puede que no sea otra cosa que el ejercicio de estos derechos *Miranda* por parte de la persona arrestada. Por tanto, todo silencio posterior al arresto es insolublemente ambiguo, debido a lo que se requiere que el Estado advierta a la persona arrestada. Ver *United States* v. *Hale*, [422 U.S. 171 (1975)], pág. 177. Más aún, aunque es cierto que las advertencias *Miranda* no contienen garantía expresa de que el silencio no conlleva penalidad, dicha garantía está implícita para cualquiera que recibe las advertencias. En tales circunstancias sería fundamentalmente injusto y constituiría una privación del debido proceso permitir que se utilizara el silencio de una persona arrestada para impugnar una explicación ofrecida posteriormente en el juicio." Págs. 617–618. Finalmente el Tribunal revocó las convicciones y devolvió los casos al foro estatal.

mento incriminatorio. Sugerir o insinuar motivaciones al silencio del acusado, o producir explicaciones en torno al mismo a base de una certeza hipotética de la prueba de cargo, susceptibles de ser finalmente interpretadas como demostración de culpabilidad, o capaces de perturbar la serenidad o ecuanimidad del jurado, equivale a su efectiva y perjudicial violación.

Concluimos, por tanto, que el comentario hecho por el fiscal durante el interrogatorio del acusado apelante Luis G. Luna Torres constituyó un comentario al silencio del acusado.

Ahora bien, lo expuesto no resuelve el caso, pues debemos despejar la incógnita de si ello automáticamente anula finalmente el proceso. En esa tarea es menester evaluar la magnitud y consecuencias del error, máxime cuando su linaje es de naturaleza constitucional.

A manera de ilustración y por su valor persuasivo, observamos que en *Chapman* v. *California*, 386 U.S. 18 (1967), el Tribunal Supremo federal rechazó la idea de que todo comentario al silencio del acusado —sin tomar en cuenta los hechos y circunstancias del caso— conlleva la revocación de la sentencia. Bajo la premisa de que tanto en la legislación federal como en la de los cincuenta estados existen estatutos y reglas para regular aquellos errores no perjudiciales que se cometen en los juicios, ese foro afirma que "[n]inguna de estas reglas, de su letra distingue entre errores constitucionales federales y errores de ley estatal o estatutos y reglas federales. Todas estas reglas, estatales o federales, sirven a un propósito muy útil en cuanto impiden anular condenas debido a pequeños errores o defectos que tendrían poca, si alguna, probabilidad de haber cambiado el resultado del juicio". Pág. 22. Además, que "[p]odría haber algunos errores constitucionales que, para establecer un caso en particular, son tan poco importantes e insignificantes que, de acuerdo con la Constitución federal, podrían considerarse inofensivos y no requerirían la revocación automática de la condena". Pág. 22.

Finalmente establece la norma que cuando se comenta en un proceso el silencio del acusado, el beneficiario de dicho comentario tiene que probar más allá de duda razonable que el error cometido no contribuyó al veredicto obtenido.

Debemos adoptar ese enfoque, pues en nuestra jurisdicción rigen las Reglas 4, 5 y 6 de Evidencia, que regulan la situación. Veamos. En el caso de autos se trata de la admisión errónea de evidencia, situación controlada por la Regla 4:

> No se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia a menos que:
>
> (1) La evidencia fue erróneamente admitida a pesar de la oportuna y correcta objeción de la parte perjudicada por la admisión, y
>
> (2) el tribunal que considera el efecto de la admisión errónea entiende que ésta fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita.

Esta regla recoge la norma judicial del "error judicial" expuesta en *Pueblo* v. *De Jesús*, 70 D.P.R. 37 (1949). Para su aplicación es preciso que se admita evidencia erróneamente, a pesar de que la parte perjudicada objetó la misma oportunamente y por el fundamento correcto. Hemos visto cómo en el caso de autos los acusados apelantes cumplieron adecuadamente con este primer requisito. Como segundo requisito se exige que al considerar el tribunal apelativo el efecto de la admisión errónea entienda que ésta fue factor decisivo o sustancial para producirse la sentencia, lo cual nos lleva a examinar si el error aquí cometido fue un factor decisivo o sustancial para el veredicto rendido por el jurado.

El examen de la prueba desfilada y la forma y manera en que se desarrolla el incidente referente al silencio del acusado Luna Torres nos mueve a concluir que no fue decisivo. Nos explicamos. Primeramente, tratándose de un

error de índole constitucional, a la luz de *Chapman* resulta necesario detectar si el error es "no perjudicial más allá de duda razonable". Además, dicho comentario debe ser evaluado integralmente, con visión de lo sucedido en el proceso. *Pueblo* v. *Verdejo Meléndez*, 88 D.P.R. 207, 218 (1963).

Para determinar si un comentario al silencio del acusado es "no perjudicial más allá de duda razonable" se han elaborado varios criterios, a saber: (a) cuán extenso es el comentario al silencio; (b) si el jurado podía haber hecho una inferencia de culpabilidad apoyándose en dicho comentario al silencio; y (c) si había evidencia que podía sostener una absolución. *Anderson* v. *Nelson*, 390 U.S. 523, 524 (1968); *United States* v. *Sigal*, 572 F.2d 1320, 1323 (9th Cir. 1978). Al ponderar sobre estos criterios los tribunales federales han tomado en consideración si se han dado instrucciones para contrarrestar el efecto de los comentarios hechos por el fiscal. Véanse *United States* v. *Haynes*, 573 F.2d 236, 239 (5th Cir. 1978); *Holden* v. *United States*, 388 F.2d 240, 243 (1st Cir. 1968); *United States* v. *Sigal*, supra; *United States* v. *Parker*, 549 F.2d 1217, 1221 (9th Cir. 1977); *United States* v. *Sanders*, 547 F.2d 1037, 1041–1042 (8th Cir. 1976); *United States* v. *Hawk*, 497 F.2d 365, 370 (9th Cir. 1974); *Haberstroh* v. *Montanye*, 493 F.2d 483, 485 (2nd Cir. 1974); *United States* v. *Noah*, 475 F.2d 688, 696 (9th Cir. 1973). Y por el juez, *United States* v. *Shultz*, 482 F.2d 1179, 1183 (6th Cir. 1973); D. B. Ayer, *The Fifth Amendment and the Inference of·Guilt from Silence: Griffin v. California After Fifteen Years*, 78 U. Mich. L. Rev. 841 (1980).

En Puerto Rico, al igual que en los casos federales citados, hemos reiteradamente resuelto casos en que el comentario al silencio del acusado ha sido subsanado por las instrucciones dadas oportunamente. *Pueblo* v. *Cotto Torres*, 88 D.P.R. 23 (1963); *Pueblo* v. *Verdejo Meléndez*, supra; *Pueblo* v. *Delgado Vega*, 88 D.P.R. 605, 606–607

(1963); *Pueblo* v. *Díaz*, 69 D.P.R. 621, 625 (1949); *Pueblo* v. *Estrada*, 51 D.P.R. 815 (1937). Así en *Pueblo* v. *Perales Figueroa*, supra, pág. 727, citando a *Pueblo* v. *Díaz*, dijimos:

> "El derecho de un acusado a no declarar y a que tal circunstancia no establezca presunción alguna en su contra no debe ser invadido por el ministerio público con comentarios adversos ni insinuaciones de clase alguna. Si lo fuera, debe recibir del juez que presida el juicio la más severa e inmediata recriminación por conducta impropia; y el jurado ser instruido por la corte inmediatamente en forma apropiada, de suerte que en ánimo de los juzgadores de hecho no pueda quedar vestigio alguno de tales comentarios vertidos ante ellos."

En el caso de autos el tribunal apelado no dio prontamente las instrucciones específicas al jurado sobre el derecho del acusado a no ocupar la silla testifical y a no producir evidencia alguna a su favor; no se produjo en ese momento ni en cualquier otro durante el juicio "la más severa e inmediata recriminación por la conducta impropia" del fiscal que actuaba en el caso. Aparentemente consideró lícitas o no perjudiciales esas expresiones. Se limitó en sus instrucciones generales a trasmitir la instrucción de rutina sobre lo que "la ley establece" en cuanto al derecho del acusado a declarar o no declarar que en nada subsanaron el error cometido.

En el citado caso, aunque no se dio "la más severa e inmediata recriminación por la conducta impropia del fiscal que actuaba en el caso", es distinguible al de *Pueblo* v. *Perales Figueroa*, pues el allí acusado *no* ocupó la silla de los testigos, lo que tendía a que el comentario fuera de por sí muy perjudicial. Los apelantes en su bien elaborado alegato nos citan, entre otros, a *Pueblo* v. *Esquilín París*, supra, afirmándonos que por comentarse el silencio del acusado se revocó la sentencia y se ordenó nuevo juicio. *Esquilín París* es distinguible. Allí el fiscal durante el contrainterrogatorio del acusado *insistió una y otra vez* en si cuando éste fue llevado al cuartel para la investigación

le informó a la detective dónde se encontraba el día de los hechos y además *recalcó* que durante la vista preliminar no levantó la defensa de coartada.[4] En otras palabras, la razón de decidir no fue solamente el comentario de silencio, sino su intensidad, grado y repetición y un claro intento de desacreditar esa defensa.

En el caso de autos esta no es la situación. Veamos si están presentes los tres criterios señalados por la jurisprudencia sobre cuán perjudicial es el comentario al silencio del acusado. Primeramente, en cuanto a su extensión. Aquí sólo se hizo una pregunta y un comentario aislado sin mayor trascendencia, a la luz de la declaración del testigo. Razonablemente podemos afirmar que el comentario fue aislado, no extenso, ni hecho en forma insistente, obstinada ni repetitiva. El segundo criterio, respecto a si el jurado podía haber hecho una inferencia de culpabilidad apoyándose en el comentario, no está presente; pues no tuvo consecuencias en cuanto a incriminar al declarante en forma alguna. El dictamen del jurado no pudo haberse basado en dicho comentario, especialmente si consideramos el tercer criterio que está inextricablemente unido al segundo. El tercer criterio trata sobre si la prueba desfilada pudo haber sostenido una absolución. Un examen cuidadoso de los hechos precisos y claros establecidos por la prueba del Ministerio Fiscal, militan fuertemente contra la posibilidad de que el comentario así efectuado diera oportunidad o fuera la base para que el jurado infiriera la culpabilidad de los acusados apelantes. La evidencia no creíble presentada por los acusados, independientemente del comentario —en el sentido de que la muerte de Luis Cruz Negrón fue en el curso de una riña directa sostenida con Pedro J. Colón (Mangó) en la cual ellos nada tuvieron que ver— no era suficiente para que el

---

[4] Igualmente sucedió en los casos de *Griffin* v. *California*, 380 U.S. 609 (1965); *Fontaine* v. *California*, 390 U.S. 593 (1968); *Anderson* v. *Nelson*, 390 U.S. 523 (1968) y *Doyle* v. *Ohio*, supra.

jurado en el desempeño honesto e imparcial de su encomienda fuera capaz de sostener una absolución. El testimonio del coacusado Luis G. Luna Torres, según reseñado precedentemente, demuestra ser tan inverosímil que ningún jurado consciente y respetuoso de sus funciones lo hubiera creído. Su declaración fue totalmente desvirtuada por las declaraciones de los testigos de cargo oculares Francisco R. Sambolín Orlandi y Zulma M. Cubillé. Al igual que los magistrados, a los jurados les es de aplicación la norma del sentido común expuesta en *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573, 582 (1961), "[los jurados no deben], después de todo, ser tan inocentes como para creer declaraciones que nadie más creería". El impacto de un incidente ocurrido ante el jurado debe evaluarse y decidirse a base de normas de razonabilidad. No es buena norma judicial presumir que el jurado posee un grado de susceptibilidad exagerado o mayor que el del ser humano ordinario y que todo ha de afectar negativamente su obligación de rendir un veredicto justo e imparcial. *Pueblo* v. *Dones Arroyo*, 106 D.P.R. 303, 311 (1977); *Pueblo* v. *Andrades González*, 83 D.P.R. 849, 859–860 (1961); y *Pueblo* v. *Rivera Romero*, 83 D.P.R. 471 (1961). Ello implicaría un sistema de administrar justicia en un medio ambiente ficticio e imaginado, ajeno a las realidades. Concluimos que el error referente al silencio del acusado, a la luz de los hechos específicos de este caso, no es de tal intensidad que resulte perjudicial más allá de una duda razonable.

Por los fundamentos expuestos se confirman las sentencias apeladas.

Así lo pronunció y manda el Tribunal y certifica la señora Secretaria General. El Juez Asociado Señor Irizarry Yunqué emitió opinión disidente a la cual se unieron el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Dávila.

(*Fdo.*) Lady Alfonso de Cumpiano
*Secretaria*

—o—

Opinión disidente del Juez Asociado Señor Irizarry Yunqué a la cual se unen el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Dávila.

Disiento. Nuestra Constitución en su Art. II, Sec. 11, dispone que ". . . el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra". A diferencia de la Constitución federal, donde el comentario al silencio del acusado se veda implícitamente por vía de la Quinta Enmienda, que protege a todo acusado contra la autoincriminación, *Griffin* v. *California*, 380 U.S. 609 (1965), nuestra Constitución incorpora dicha protección expresamente entre los derechos acordados a todo acusado en un proceso criminal. La norma esbozada en este caso se aparta de la doctrina federal y de la prohibición expresa de nuestra Constitución.

*Chapman* v. *California*, 386 U.S. 18 (1967), citado en la decisión del Tribunal, no es a mi juicio autoridad para resolver como resuelve la opinión de este Tribunal. Todo lo contrario. Allí se dijo:

> Sin duda, un error, error constitucional, al admitir ilegalmente evidencia o comentarios altamente perjudiciales, *coloca, sobre una persona distinta a la perjudicada por dicho error, el peso de demostrar que el mismo no fue perjudicial.* Es por esta razón que la regla original de derecho común sobre el error no perjudicial pone sobre aquel que se beneficia del error el peso ya sea de probar que no hubo daño o de tener que enfrentarse a la revocación de una sentencia obtenida erróneamente. (Énfasis suplido.) Pág. 24.

Nótese que es el Estado y no el acusado quien tiene que probar que el comentario no fue perjudicial.

Añadió el Tribunal:

> Nosotros, por lo tanto, no hacemos otra cosa que adherirnos al significado del caso *Fahy* cuando sostenemos, como lo hacemos ahora, que antes de determinar si un error federal

constitucional puede considerarse no perjudicial *el tribunal debe poder expresarse en el sentido de que el mismo no fue perjudicial más allá de toda duda razonable.* (Énfasis suplido.) Pág. 24.

Después de analizar los comentarios del fiscal y las instrucciones impartidas por el juez concluyó el más alto tribunal federal:

> *Bajo estas circunstancias nos es completamente* imposible *decir que el Estado ha demostrado, más allá de toda duda razonable,* que los comentarios del fiscal y las instrucciones impartidas por el juez sentenciador no contribuyeron a las convicciones del peticionario. Esta automática y repetitiva negación de derechos constitucionales, calculadamente dirigida a desvalorizar la versión que da el peticionario de su evidencia, no puede considerarse menos perjudicial que la introducción de una confesión forzada en contra de un acusado. Véase, por ejemplo, *Payne* v. *Arkansas,* 356 U.S. 560. Los peticionarios tienen derecho a un juicio libre de toda presión de inferencias inconstitucionales. (Énfasis suplido.) Pág. 26.

Véase también *Fontaine* v. *California,* 390 U.S. 593 (1968). De lo anterior se coligen las siguientes normas para determinar si un comentario al silencio del acusado no fue perjudicial:

(1) El Estado, que fue el beneficiario del comentario, tiene el peso de probar que el comentario no fue perjudicial, y

(2) el Tribunal tiene que convencerse más allá de duda razonable de que el comentario no perjudicó al acusado.

La decisión de este Tribunal aplica las Reglas 4, 5 y 6 de Evidencia en el análisis de casos en que se comenta el silencio del acusado para finalmente imponer al *acusado* el peso de probar que el error fue perjudicial, imponiendo a su vez un grado de prueba mayor que el requerido por el Tribunal Supremo federal al Estado para demostrar que el error justifica una revocación.

Dispone la Regla 4 de Evidencia:

Regla 4. *Efecto de error en la admisión de evidencia*

No se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia a menos que:

(1) La evidencia fue erróneamente admitida a pesar de la oportuna y correcta objeción *de la parte perjudicada por la admisión,* y

(2) el tribunal que considera el efecto de la admisión errónea entiende que ésta fue *factor decisivo* o *sustancial* en la sentencia o decisión cuya revocación se solicita.

Dicha regla en su inciso 1 le impone el peso de la prueba al que fue perjudicado por la admisión y en su inciso 2 establece que la admisión errónea tiene que ser un factor decisivo o sustancial en la sentencia para justificar la revocación. Esa norma, en lo concerniente a comentarios al silencio del acusado está en abierto conflicto con la norma federal esbozada en *Chapman,* supra, y con la prohibición expresa de nuestra Constitución.

Los Estados pueden ampliar, pero no menoscabar, los derechos de todo acusado más allá de las fronteras establecidas por la constitución federal y su interpretación por el Tribunal Supremo federal. *United States* v. *Robinson,* 414 U.S. 218 (1973); *Gustafson* v. *Florida,* 414 U.S. 260 (1973); y *Pueblo* v. *Dolce,* 105 D.P.R. 422, 427 (1976). La norma elaborada en este caso viola dicho mandato.

En *Anderson* v. *Nelson,* 390 U.S. 523 (1968), el Tribunal añadió los siguientes criterios para poder determinar si un comentario al silencio del acusado justifica una revocación:

Coincidimos con el Juez Ely en que un comentario sobre la decisión de un acusado a no declarar, no puede calificarse como error no perjudicial en un caso *en que dicho comentario es extenso, en que se recalca ante el jurado, como base para la convicción, que puede inferirse culpa de ese silencio, y en que hay evidencia que pudo haber justificado la absolución del acusado.* (Énfasis suplido.) Págs. 523–524.

En *Doyle* v. *Ohio*, 426 U.S. 610 (1976), un caso similar al de autos, el Tribunal Supremo federal prohibió el comentario al silencio del acusado desde que éste es arrestado (*post arrest silence*). Razonó de la siguiente manera:

A pesar de la importancia del contrainterrogatorio, hemos concluido que la decisión de *Miranda* nos obliga a rechazar la posición del Estado. Las advertencias que dicho caso ordena como medida profiláctica para salvaguardar los derechos otorgados por la Quinta Enmienda, ver *Michigan* v. *Tucker*, 417 U.S. 433, 443–444 (1974), requieren que a una persona tomada bajo custodia se le advierta *inmediatamente* que tiene derecho a permanecer callada, que cualquier cosa que diga puede ser usada en su contra, y que tiene derecho a contratar un abogado o a que se le asigne uno antes de someterse a interrogatorio. *El silencio a raíz de estas advertencias puede que no sea otra cosa que el ejercicio, por el arrestado, de estos derechos promulgados en Miranda.* Entonces, todo silencio posterior a un arresto es irremediablemente ambiguo precisamente por lo que el Estado viene obligado a advertirle al arrestado. (Énfasis suplido.) Pág. 617.

Se ha determinado que se puede comentar el silencio del acusado antes de que éste sea arrestado (*pre-arrest silence*) *para poder impugnar su credibilidad si éste declara en el juicio. Jenkins* v. *Anderson*, 447 U.S. 231 (1980); *Pueblo* v. *González Colón*, 110 D.P.R. 812 (1981). Esa no es la situación en el caso ante nos.

En *Pueblo* v. *Díaz*, 69 D.P.R. 621, 625 (1949), reconocimos que un comentario al silencio del acusado puede quedar subsanado por "instrucciones específicas dadas *inmediatamente* al jurado por el juez del tribunal inferior", (énfasis suplido) en adición a las instrucciones generales del propio juez sobre el derecho del acusado de abstenerse de declarar. Véase también a *Pueblo* v. *Verdejo Meléndez*, 88 D.P.R. 207, 218 (1963). Esto tampoco se hizo aquí.

Veamos los hechos de este caso. El primer comentario

al silencio del acusado ocurrió en el contrainterrogatorio de Luis G. Luna Torres:

P. La pregunta es: ¿A usted lo detuvieron con relación a estos hechos?

R. Sí, señor.

P. ¿Entonces lo llevaron dónde?

R. Al cuartel de la policía.

P. Ahora, usted no tenía que ver nada con relación a estos hechos, ¿eso es cierto o no es cierto?

R. No, señor.

P. Entonces le pregunto si usted le informó a la policía: "Un momento, quien disparó allí fue Mangó, yo no tuve nada que ver con esos hechos, ni Miguel, ni Orlando tampoco."

R. Bueno, no se lo dije.

P. ¿No se lo dijo?

LIC. GALIB:

V[uestro] H[onor], vamos a solicitar un *mistrial* en este caso.

Posteriormente, durante el informe al jurado, dijo el fiscal:

Con la venia del Tribunal y los caballeros del Jurado. Durante estos días hemos estado aquí. Es el testigo Luna, el mesero de Ponce que vino una semana antes de los hechos, el que no sabía si en La Balanza trabajaban mujeres, el que no sabía si los cuartos quedaban atrás o lejos, los cuartos de La Balanza. Ese es el que como que aquí no ha pasado nada supuestamente de un delito, digo, de un tiroteo, él dijo que vio que Mangó le disparó a Cruz Iglesias [*sic*] y como el que se chupa una *limberg* [*sic*] de coco se fue a trabajar para La Balanza. *A preguntas del Fiscal. ¿Notificó usted la policía? No, señor. Le pregunto a ustedes, ¿es esa la actuación típica, es esa la actuación correcta de un ser humano, es eso creíble?* El hombre al sentarse . . . . (Énfasis suplido.)

No hay duda de que en este caso se comentó el silencio

del acusado mientras éste ya estaba arrestado (*post arrest silence*). El fiscal trató de llevar a la mente del jurado una inferencia de culpabilidad en aras de su silencio.

Aparte de lo expuesto, considero que conforme al caso de *Anderson*, supra, hubo prueba que pudo justificar una absolución. La teoría del fiscal fue que todos los acusados dispararon en contra del occiso a una distancia de tres pies. La Defensa alegó que la muerte ocurrió como consecuencia de una riña que se desarrolló entre Mangó y el interfecto. Si fue verdad que cuatro personas dispararon contra Cruz Negrón a una distancia de tres pies, ¿cómo explicar que solo aparecieran dos balas en el cuerpo de Cruz y que no hubiera perforaciones en su carro, del cual estaba recostado al momento de hacerse los disparos? El testimonio del patólogo demostró que las dos heridas de bala provinieron de similares trayectorias en cuanto a dirección, inclinación y lugar de impacto y ocurrieron a una distancia mayor de tres pies.

Si es verdad que cuatro personas dispararon contra Cruz, resulta inexplicable que el agente investigador Vargas no pudiera encontrar plomos de balas o casquillos adicionales en la escena del crimen.

Si ocurrió el incidente como relatan los dos testigos del Pueblo, ¿qué explicación puede haber para el hematoma en los nudillos del occiso y las erosiones en la piel y las muñecas, todas compatibles con la versión de los acusados de que la muerte ocurrió como consecuencia de una riña entre Mangó y Cruz? Toda esta prueba sostiene la versión de los acusados.

Es obvio, atendidos los hechos de este caso, el efecto devastador ante el jurado del comentario al silencio de los acusados hecho dos veces: en la repregunta por el fiscal y en su informe final.

Dijimos en *Pueblo v. Perales Figueroa*, 92 D.P.R. 724, 726–727 (1965):

El silencio del acusado por su destino —eficaz instrumento

para la garantía de la presunción de inocencia y del privilegio de no incriminarse— es digno del más profundo respeto; su invasión no está permitida a nadie; no se debe permitir cualquier intento de convertirlo en factor o elemento incriminatorio. Sugerir o insinuar motivaciones al silencio del acusado, o producir explicaciones en torno al mismo a base de una certeza hipotética de la prueba de cargo, susceptibles de ser finalmente interpretadas como demostración de culpabilidad, o capaces de perturbar la serenidad o ecuanimidad del jurado, equivale a su efectiva y perjudicial violación.

En *Pueblo* v. *Díaz*, supra, pág. 629, dijimos:

El derecho de un acusado a no declarar y a que tal circunstancia no establezca presunción alguna en su contra no debe ser invadido por el ministerio público con comentarios adversos ni insinuaciones de clase alguna. Si lo fuera, debe recibir del juez que presida el juicio la más severa e inmediata recriminación por conducta impropia; y el jurado ser instruido por la corte inmediatamente en forma apropiada, de suerte que en el ánimo de los juzgadores de hecho no pueda quedar vestigio alguno de tales comentarios vertidos ante ellos.

En el caso de autos el tribunal apelado no dio prontamente las instrucciones específicas al jurado sobre el derecho del acusado a no ocupar la silla testifical y a no producir evidencia alguna a su favor; no se produjo en ese momento ni en cualquier otro durante el juicio "la más severa e inmediata recriminación por la conducta impropia" del fiscal que actuaba en el caso. Aparentemente consideró lícitas o no perjudiciales esas expresiones. Se limitó en sus instrucciones generales a transmitir la instrucción de rutina sobre lo que "la ley establece" en cuanto al derecho del acusado de declarar o no declarar, que en nada subsanaron el error cometido.

Véanse también *Pueblo* v. *Esquilín París*, 96 D.P.R. 415 (1968), 98 D.P.R. 505 (1970) (en reconsideración); *Pueblo* v. *Estrada*, 51 D.P.R. 815, 820 (1937); y *Pueblo* v. *Álvarez Trinidad*, 85 D.P.R. 593 (1962).

Por las razones expuestas dispondría la revocación de la sentencia apelada y ordenaría la celebración de un nuevo juicio.